**TATTEN PARTNERS, L.P., Appellant,**

v.

**NEW CASTLE COUNTY BOARD OF AS-SESSMENT REVIEW and New Castle County, Delaware, Appellees.**

No. 92A–07–005.

Superior Court of Delaware, New Castle County.

Submitted: June 18, 1993.
Decided: Sept. 9, 1993.
Motion for Reargument: Sept. 24, 1993.
Decided: Oct. 19, 1993.

Gordon W. Stewart, and Richard A. Forsten, of Duane, Morris & Heckscher, Wilmington, for appellant.

Dennis J. Siebold, and Stephen L. Nowak, argued, of New Castle County Law Dept., Wilmington, for appellees.

## OPINION

BARRON, Judge.

On March 15, 1988, Tatten Partners, L.P. (Tatten) filed an annual assessment appeal to the Board of Assessment Review of New Castle County (the Board), alleging that its property at 22 Delaware Avenue, Wilmington, Delaware (the property) was substantially overassessed. The County had originally assessed the value of the property at $39,762,600, in terms of July 1, 1983 values.[1] In its appeal to the Board, Tatten sought a reduction to $31,000,000, which it later increased to $31,500,000. A hearing was initiated before the Board on April 20, 1989, but one day did not provide sufficient time to hear all the testimony. The Board therefore continued the hearing to a "mutually convenient time." I–104.[2] The hearing was reconvened on May 14, 1992, and concluded June 9, 1992. In its Notice of Decision, dated June 9, 1992, the Board reduced the assessment value from $39,762,600 to $37,659,000 in order "to reflect revised cap-rate and other testimony that property [was] over-assessed." III–141.

On July 8, 1992, Tatten filed a "Petition, Complaint and Notice of Appeal Pursuant to 9 *Del.C.*, § 8312 and Superior Court Rule 72." In addition to appealing the Board's decision, Tatten alleged that the County and the Board violated its constitutional rights to due process and equal protection of law, seeking damages and attorney's fees pursuant to 42 *U.S.C.* §§ 1983 and 1988. When the County failed to file the record within 20 days of receiving the Citation, Tatten filed a Motion for Default Judgment. This Court denied that Motion and directed the County to file the record no later than March 5, 1993. The Board filed the record on March 5, 1993.

In its brief, Tatten argues first that the Board's decision should be reversed because it was not supported by competent or substantial evidence in that the County (1) ignored actual construction costs, (2) applied rental rates in excess of actual area rates, (3) presented no evidence to support its capitalization rate, and (4) performed no sales comparison analysis. Tatten also argues that the Board violated its constitutional right to substantive due process by delaying the hearing for four years and by failing to adjust the assessment of record, thereby forcing Tatten to pay taxes on the full $39,762,600 assessment amount for the years 1988 through 1991 and on the $37,659,000 amount in 1992.

The County responds that the Board's decision was supported by substantial evidence on the record and was not arbitrary, capricious or contrary to law. In response to Tatten's civil rights claim, the County has filed a Motion to Strike the relevant portions of Tatten's petition and opening brief on the grounds that this Court lacks jurisdiction over matters not raised before the Board.

### FACTS

In 1985, Tatten acquired the land parcels that now constitute the property in question for a purchase price of $4,252,168. The property is located at the corner of Delaware Avenue and Tatnall Street in the central business district of the City of Wilmington. During 1987, Tatten constructed a 17–story building comprising 282,562 square feet of rentable floor area, which includes parking, retail and office space. The construction costs were $31,597,638. Thus the total cost of the property, now known as the Bank of Delaware Plaza, was approximately $35,849,806.

---

**1.** In compliance with the state constitutional mandate of uniform taxation, New Castle County takes present-day property values and factors them back to a base year, currently established as 1983. *See Cronin v. Board of Assessment Review*, Del.Super., C.A. No. 91–A–05–08, 1992 WL 52181, Bifferato, J. (Feb. 26, 1992). This method of assessment has been declared to be constitutional by the Delaware Supreme Court. *Board of Assessment Review v. Stewart*, Del.Supr., 378 A.2d 113 (1977).

**2.** The transcript of the testimony is contained in Volumes I and III, referring to April 20, 1989, and June 9, 1992, respectively. The exhibits presented to the Board on May 14, 1992, are contained in Volume II. Hereafter, references to testimony and exhibits will be made by volume and page number. Thus, a citation to "III–13" refers to Volume III, page 13.

For the tax year beginning on July 1, 1989, New Castle County assessed the property for *ad valorem* tax purposes at $39,762,600, expressed in July 1, 1983 values. After receiving notice of the assessment in January 1988, Tatten filed an appeal with the Board on March 15, 1988, seeking a reduction to $31,000,000, which it later increased to $31,500,000. With its appeal, Tatten supplied extensive data and materials, including an appraisal made by its expert, Robert Hickman. Tatten requested that the County provide Tatten with any appraisal report or other documentation upon which the County intended to rely. The County failed to provide any information and apparently indicated that none was available.

On April 20, 1989, the hearing began. Tatten presented its evidence and the testimony of Hickman, a licensed appraiser with 30 years of real estate experience. II–118, 119; III–35. Hickman presented the results of his analysis, using the capitalization of income approach, the cost approach and the market (or sales comparison) approach, which are the three recognized methods of determining a property's value.[3] Although he made separate analyses using each of the three methods, Hickman relied most heavily on the income approach. Hickman testified that the fair market value of the property stated in terms of July 1, 1983, values is $31,500,000. At the end of the day, counsel for the County concluded his cross-examination of Hickman, and the hearing was continued until a "mutually convenient time." I–104.

On May 14, 1992, Tatten appeared before the Board and asked the Board to (1) rule that Tatten had carried its burden of producing competent evidence of substantial overvaluation, (2) require the County to present evidence in support of the assessment of record, and (3) rely on the record from the 1989 hearing so Tatten would not have to put on its case again. The County opposed Tatten's request to rely on the record and asked the Board to require that Tatten present its case a second time. The Board ruled in favor of the County.

The hearing continued on June 9, 1992. After Tatten presented its evidence, Albert A. Valiante testified for the County. Valiante is an Assessor III who supervises other County assessors and who has worked for the Assessment Division for 15 years. Valiante testified that he had originally placed the assessment of record against the property. In arriving at a valuation of $39,326,700, he considered all three approaches to valuation but did not reach a value under the market approach because at the time of the original assessment he found no comparable property sales.

At the conclusion of the hearing, the Board concluded that the capitalization rate of 8.8 percent used by the County was too low and that the appropriate rate was 9.1 percent. As a consequence, the Board lowered the total appraisal value from $39,762,600 to 37,659,000. The Board made no comment on any of the other evidence presented by Tatten. In its Notice of Decision dated June 9, 1992, the Board recorded the monetary re-

---

**3.** The three methods of valuation can be summarized as follows:

"In the Market Approach recent sales of similar properties are examined and compared to the subject property. Market oriented adjustments are made for any differences between the comparable sales and the subject property.

"The Income Approach is a method of arriving at the estimated value of the property by analyzing the potential income and expenses from income producing real estate. The net income is then capitalized to indicate the value of the property as an investment. It assumes a return based on that which competitive properties are receiving.

"In the Cost Approach, the site and improvements are treated separately for analytical pur-

poses. By means of a market analysis, the site is valued independently as if vacant and ready to be put to its highest and best use.

"Next, the reproduction cost new of the improvements is estimated. This represents the most probable cost of building a replica structure. From this estimate is deducted all depreciation or utility loss accruing to the building.

"The depreciated cost new is then added to the total site improvements and land value to arrive at the indicated value from this analysis."
*Seaford Associates, L.P. v. Board of Assessment Review*, Del.Supr., 539 A.2d 1045, 1046 n. 1 (1988).

duction and stated that "[this reduction is] to reflect revised cap-rate and other testimony that property [was] over-assessed." The Notice did not specify which part or parts of the evidence the Board found to support overvaluation, and the numbers reflect only the result of the slightly higher capitalization rate—despite the acknowledgement that "other testimony" also evidenced overvaluation.

## STANDARD OF REVIEW

▉ A taxpayer aggrieved by the assessment of his property has the right to bring an appeal before the Board of Assessment Review and then to appeal the Board's decision to this Court. 9 Del.C., § 8311(a) and 8312(b) and (c). The taxpayer who chooses this path faces "a substantial evidential burden at both the administrative and appellate levels." *Seaford Associates, L.P. v. Board of Assessment Review*, Del.Supr., 539 A.2d 1045, 1047 (1988). On a taxpayer's appeal of the assessment of record made against his property,

> a *prima facie* case of accuracy is made by the assessment record. The burden of presenting evidence to meet the *prima facie* case and to rebut the presumption rests upon the property owner. To fulfill the purpose, the *owner's evidence must not only be competent; it must be sufficient to show a substantial overvaluation*. If rebutted by such evidence, the presumption in favor of the accuracy of the assessment ceases to exist. (Emphasis added.)

*Fitzsimmons v. McCorkle*, Del.Supr., 214 A.2d 334, 337 (1965). *See also Delaware Racing Association v. McMahon*, Del.Supr., 340 A.2d 837 (1975); *Seaford Associates, L.P. v. Board of Assessment Review*, 539 A.2d at 1047. If the Board "should find that the assessment is greater than it should be . . . ," the Board shall order the assessment to be reduced. 9 Del.C., § 1305(2).

▉ On appeal to this Court, "[t]he decision of each board of assessment or department of finance shall be *prima facie* correct and the burden of proof shall be on the appellant to show that such body acted contrary to law, fraudulently, arbitrarily or capriciously." 9 Del.C., § 8312(c); *Board of Assessment Review v. Stewart*, Del.Supr., 378 A.2d 113, 116 (1977). The reviewing court is not to reverse if it finds that the Board relied in part on incompetent evidence but only if "the Board's findings are clearly wrong and its conclusions not the product of an orderly and logical deductive process." *Rodney Square Investors, L.P. v. Board of Assessment Review*, Del.Supr., No. 256, 1982, Horsey, J. (April 7, 1983) (ORDER) (citing *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972)).

## DISCUSSION OF THE APPEAL

Tatten argues that the Board acted arbitrarily and capriciously in ignoring Tatten's extensive testimony and documentation in support of its contention that the value of the property, expressed in July 1, 1983 terms is $31.5 million. Tatten also argues that its evidence was sufficient to rebut the presumption of accuracy and was unrebutted by the County employee who could not recall making the initial assessment and offered little foundation for the assessment of record.

### The Cost Approach to Valuation

▉ In regard to the cost approach, Tatten argues that the Board erred in relying on the County's analysis, which Tatten claims was rendered incompetent by Valiante's use of (1) construction cost figures from another office building in Wilmington rather than the actual construction costs of the Bank of Delaware and (2) a hand calculator method which yielded a 1983 reproduction cost approximately $4 million higher than the sum of the actual 1985 land purchase price and actual 1987 construction cost.

An appraiser using the cost approach first determines the underlying value of the land as if it were vacant, adds the cost of constructing the improvements and then subtracts depreciation. In determining the con-

struction costs, Hickman found their value to be $28.44 million expressed in 1983 values. In contrast, Valiante found the construction costs to be $35,754,800 in 1983 values.

This significant discrepancy occurred because of the different bases used for calculation. Hickman started with the actual 1987 construction cost of $31,597,638 and factored it back to 1983 value by dividing it by 1.111, the adjustment factor indicated by the Marshall Valuation Service[4] for the time period, location and type of building involved. Hickman then checked the resulting value of $28.44 million by running the Marshall Valuation Service computer model which incorporates a series of data about the property into the computer program. The computer model indicated estimated costs of $29.7 million for 1983, in corroboration of the actual $28.44 million.

Hickman's final step was to add the adjusted land cost, arriving at a total reproduction cost of approximately $32 million in 1983 values.

It is less clear how Valiante arrived at his total reproduction cost of $39.3 million in 1983 values. At the hearing, Valiante presented a single sheet of calculations yielding a construction cost of $35,754,800 in 1983 values—$4,157,162 greater than the actual costs for both purchase and construction. Valiante acknowledged that he did not use the actual construction costs as the basis for this figure. Rather, he testified that he "basically was looking at a couple of sources." However, the only source he was able to identify was the Chase Manhattan building, which had recently been completed. Valiante testified that he selected the Chase building as a basis for estimating the cost of the Bank of Delaware building because "there was a lot of public information that was available, and so we were able to look at some of their cost figures also." III–81. He did not describe how the two buildings are similar (or indeed whether they are similar) but only that they are "fairly comparable

buildings." III–81. He did not explain why he chose to use comparison figures when the actual figures were available. Thus, Valiante used data from one "fairly comparable building" and "various sources of information," which he was not able to identify, to arrive at a 1983 construction cost more than $4 million greater than the actual 1987 cost.

When he added the land cost to the construction cost, Valiante's total reproduction cost expressed in 1983 values was $39.3 million. This figure is $7 million greater than the figure arrived at by using the actual costs adjusted to 1983 values. It is $4 million greater than the sum of the actual 1985 land cost and the 1987 construction cost.

Tatten argues that *Three Hundred Delaware Avenue Associates v. Board of Assessment Review,* Del.Super., C.A. No. 5174–75, Walsh, J., (May 7, 1976) (Letter Opinion), stands for the proposition that actual data are by law preferable in making appraisals, and the County responds that the case involves the income rather than the cost approach. In *Three Hundred,* the parties agreed that the income approach was the most useful, but each used a different set of data. The County based its appraisal on a projection of general economic rents, expenses and vacancy rates, whereas the appellant used the actual income experience of the property at issue adjusted to the then-base year of 1970. The Court reversed the decision of the Board adopting the County's assessment value, stating that in the absence of bad faith or distortion the use of general economic values rather than actual figures was unwarranted and conjectural. At least as part of the income approach, the Court expressed a distinct preference for actual costs over economic factors:

> [T]he County's appraiser rejected actually experienced data in favor of "normalization" and the "average experience" of other property owners. In the absence of a showing of bad faith or distortion by the taxpayer *this approach was highly conjec-*

4. Marshall Valuation Service is a nationally recognized cost and appraisal service whose expertise was acknowledged and relied upon by both Hickman and Valiante.

*tural.* In accepting this presentation without question or qualification the Board acted improperly. Since the Board gave no reasons for its decision other than the cryptic adoption of the economic rent theory, the Court must assume that it rejected the property owners position without attempting to assess the merit of owners presentation of value. Such an approach amounts to little more than "rubber stamping" the conclusions of the Board's agent. The fundamental unfairness of that process is apparent. (Emphasis added.)

*Id.* at 3, 4.

Although the court's finding in *Three Hundred* pertained to the use of comparables in the income approach rather than in the cost approach, this Court's view is that the use of economic comparables is equally undesirable in the cost approach. The goal of the cost approach is to arrive at a value based on separate analyses of the land and the improvements in question, which are both unique unto themselves; the income approach derives a value by assessing potential income particularly from rental rates, which lend themselves to comparison with similar buildings in similar locations. Although actual data may not *always* be preferable when the cost approach is used, this Court finds that actual cost data is preferable over references to unspecified sources and data from a single other building, as in Valiante's assessment in the case at bar.

The Court is satisfied that in regard to the cost approach, Tatten provided competent evidence of overvaluation by the County sufficient to rebut the presumption of accuracy and that the County was unable to substantiate its cost approach figure. The Board summarily rejected Tatten's position without attempting to assess its merits, and this Court, like the *Three Hundred* court, considers this rubber-stamping to be fundamentally unfair. *Id.* Based on this finding, the Court holds that the Board acted arbitrarily and capriciously in ignoring the competent evidence brought before it by Tatten.

### The Income Approach to Appraisal

Tatten challenges two aspects of the results of the County's income analysis, the basis for rental rates and the capitalization rate used to convert projected income into a property value. An appraiser using the income approach derives a value for the building by establishing the potential gross income generated by the building (rental rate per square foot multiplied by square feet), and adjusting the gross income amount for vacancies and expenses to arrive at a net operating income, which is then converted to a property value by dividing the amount of net income by the capitalization rate. This method of calculating an income approach value is known as the direct capitalization method.

In cases where the building at issue was in existence during the base tax year, the preferred method for establishing an income valuation on a property is to use actual data on the specific property. *Three Hundred* at 3, 4. Since the property in the case *sub judice* did not exist in the base tax year 1983, it was necessary for both appraisers to construct a model to estimate how much income the property would reasonably have generated in 1983. The discrepancies in the parties' analyses arise in the choice of which set of numbers to start with, actual experience of comparable properties in 1983 or general economic data. Tatten alleges that both the rental rates and the capitalization rate used by the County were inaccurate and unsupported. Since each of these variables has significant impact on the final result of the income approach, the Court addresses each one in turn.

■ *Rental rates.* At the hearing, Tatten introduced a plethora of data to substantiate Hickman's rental rates and thereby show overvaluation in the assessment of record. Information was introduced to demonstrate that the rental rates for 12 comparable buildings in 1983 ranged from $14 to $17 per square foot, before adjusting for concessions typically made to tenants (such as free rent at the beginning of the lease period). The average rental rate per square foot for Class A building space was $17, which was the market rent Hickman started with for 1983

values. He also examined actual leases made during this period which showed that (1) tenants who rented more than 60,000 square feet were given a rate $0.50 to $0.75 per square foot lower than other tenants and (2) the leases typically had a five-year duration and included either three or six free months of free rent, which amounted in a five-to-ten percent deduction. Based on this information, Hickman concluded that the market rent of $17 for office space should be reduced to $15.26 for the lead tenant and $15.87 for the other office tenants. Tatten also introduced the actual rental rates of the property in 1988, which ranged from $19 to $18.50 for office space. A review of the record indicates that the County put forth no evidence to rebut these facts.

Rather than using actual data from similar buildings in 1983, Valiante relied on general economic figures to estimate income that the property may have generated if it had been in existence in 1983. Although the County argues that Valiante relied on "a wide variety of local and national sources," Valiante in fact referred to a "number of sources" but failed to name them, state what information he derived from them or describe his extrapolation process. III–84. His testimony regarding his method consists of the following statement: "We had information where we contacted various brokers, property managers, the review and examination of the market at that time." III–84. None of this "information" was introduced into evidence at the hearing, nor was Valiante able to provide any specific figures resulting from his efforts. He ascertained a range of rental rates for 1983 and selected the highest end of the range to use in his calculations. In addition to lacking a foundation in fact or figure, these rates reflect a mere 5.5 percent decrease from 1988 actual rental rates, despite the uncontroverted evidence that Wilmington rental rates increased approximately 11 percent from 1983 to 1987. The County argues that reliance on general economic information is necessary to avoid basing taxes on the

managerial success or failure of property owners. However, Hickman's analysis was not based on the relative success of the owners of the property (since it did not exist in 1983) but rather on rental rates of not one but twelve existing Class A buildings in similar locations. The Court finds that Tatten's evidence of 1983 rental rates based on twelve similar buildings in similar locations was sufficiently competent to rebut the *prima facie* accuracy of the record below and that the Board acted arbitrarily and capriciously by failing to address this evidence.

■ *Capitalization rate.* Tatten also contends that the County's capitalization rate of 8.8 percent was inordinately low. The final step in the income approach to appraisal is to convert the net operating income into a property value. This is accomplished by dividing the amount of net operating income by the then-current capitalization, or cap, rate. Thus the higher the cap rate, the lower the ultimate value attributed to the property.

Hickman divided a net operating income of $3,007,289 by a cap rate of 10.6 percent, yielding a projected value in 1983 terms of $28,370,650.94. He also applied a range of then-current cap rates from 9.6 to 11.6 percent, yielding a range of value in 1983 terms from $31.3 to $25.9 million. III–45–52; II–94–101. Hickman testified that he arrived at his recommended rate of 10.6 percent by evaluating cap rates used by insurance companies and investors, comparable sales rates, and other mortgage interest rates in effect during the relevant time period. These data showed cap rates ranging from 8.37 percent to 12 percent. The Real Estate Research Corporation median capitalization rate for office buildings during the period was 9.3 percent.[5] After looking at the available data, Hickman concluded that the base rate for the property in 1983 was 9.5 percent, adjusted by 1.1 percent for property taxes to 10.6 percent. These data were presented to the Board and entered into evidence.

To check his results from the direct capitalization method, Hickman performed a dis-

---

5. Real Estate Research Corporation is a Chicago-based firm that generates a survey of median cap rates based on national economic indicators for a given period of time.

counted cash flow analysis, which forecasts what investors would look for as a future yield on a given piece of property. This second analysis yielded a range of value from $29.6 to $31.3 million for 1983. This evidence was also presented to the Board. III–51–55; II–100–101.

Valiante divided a net income of $3,427,541 by a cap rate of 8.8 percent to arrive at a property value of $38,949,329. He testified that he "consulted a number of local sources; also some of the sources that Mr. Hickman testified to." However, he was unable to identify his sources or present any data derived from them. III–85. Before the 1.1 percent adjustment for property taxes, Valiante's base cap rate was 7.7 percent, "the lowest rate of the ranges of rates that were made available to us at that time." III–85. However, Valiante was not able to cite the range of rates he used or to demonstrate that his choice was anything but a conclusory opinion: "it was my opinion that the lower cap rate, the lowest cap rate, made sense on this particular piece of property." III–116. When asked if he found any rates lower than 7.7 percent, Valiante replied "I can't recall." III–116. Certainly an expert witness is entitled to express opinions, but those opinions are more credible when the witness provides supporting evidence from within his field of expertise.

After hearing the evidence, the Board concluded that the County's cap rate of 8.8 percent was "exceptionally low for the time involved...." III–133. The Board selected a capitalization rate of 9.1 percent, yielding a property value of $37,659,000 when applied to Valiante's net operating income.

This Court is satisfied that Tatten produced evidence sufficient to overcome the presumption of accuracy in favor of the assessment in regard to the appropriate capitalization rate to apply in the income approach. *Seaford Associates, L.P. v. Board of Assessment Review*, 539 A.2d at 1047; *Delaware Racing Association v. McMahon*, 340 A.2d at 840. Although the Board increased the cap rate from 8.8 to 9.1 percent, this

Court finds that this minimal, unexplained 0.3 percent adjustment was arbitrary and capricious in light of the evidence. 9 *Del.C.* § 8312(c); *Board of Assessment Review v. Stewart*, 378 A.2d at 116.

■ In Delaware, as in other jurisdictions, the capitalization of income method is the preferred method for appraising incomeproducing properties. *Seaford Associates, L.P. v. Board of Assessment Review*, 539 A.2d at 1048. Furthermore, "the capitalization of income method in combination with another valuation method is competent evidence of valuation and *cannot be ignored by a Board of Assessment*." (Emphasis added.) *Id.* at 1049. In the case at bar, Tatten presented extensive evidence based on the income approach as well as both of the other accepted methods of valuation. This Court finds that the Board ignored Tatten's evidence of substantial overvaluation in a manner that was arbitrary, capricious and contrary to law.

### The Market (or Sales Comparison) Approach

Tatten argues that the County failed to perform a sales comparison analysis and that this failure is further evidence that the County's methodology was "incomplete and slipshod." The County responds that its appraiser did conduct a market analysis but placed little emphasis on its results because of the lack of comparable sales during the base year of 1983. Further, the County argues that an appraiser is not obligated to apply (as opposed to consider) all three valuation techniques and that the Board members were entitled to disregard Tatten's market analysis if they so chose.

To establish a basis for comparison, Hickman used sales of comparable properties in both Wilmington and Philadelphia, since the local market of comparable buildings is limited. The result of this analysis was a value from $31.9 to $33.4 million for 1983. Although this figure generally confirmed the results of his other two analyses, Hickman placed less emphasis on this method than on the others.

Valiante also concluded that the market approach was of the least help in appraising the property. For this reason, he apparently did not conduct a market analysis but preferred to rely on the results of the cost and income analyses.

■ It is clear that appraisers are not required to use all three approaches in evaluating a property. *Rodney Square Investors, L.P. v. Board of Assessment Review*, Del. Supr., No. 256, 1982, Horsey, J. (April 7, 1983) (ORDER). In fact, when the capitalization of income method is used in combination with one of the other available methods, the results constitute competent evidence of valuation. *Seaford Associates, L.P. v. Board of Assessment Review*, 539 A.2d at 1048. In the case at bar, the appraisers for both parties agreed that the income capitalization approach was the most reliable one and that it was adequately supplemented by the cost approach. The parties also agreed that the market approach was the least helpful because of the small market in Wilmington. This Court therefore finds that the County's decision not to apply a market approach does not demonstrate an "incomplete and slipshod" analysis.

### Summary of the Issues on Appeal

This Court finds that although the appellant presented competent evidence of overvaluation based on all three methods of valuation the record is void of any indication that the Board considered this evidence, except for the evidence of the unreasonably high cap rate. The Court therefore holds that the Board was "clearly wrong" in failing to consider Tatten's evidence and that its unexplained decision only to make a minimal adjustment in the capitalization rate was "not the product of an orderly and logical deductive process." *Rodney Square Investors, L.P. v. Board of Assessment Review, supra* at 3.

### DISCUSSION OF THE § 1983 CLAIM

Tatten also argues that the County and the Board violated its substantive due process rights under 42 *U.S.C.* § 1983 by failing to (1) hold a hearing in 1988 and (2) reduce the property's assessment in accordance with the evidence presented by Tatten.[6] The County responds that an action arising under § 1983 is not within the Board's statutory authority, nor within this Court's appellate jurisdiction.

■ It is undisputed that § 1983 is a remedial statute which provides a civil cause of action for state deprivation of federal statutory or constitutional rights. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *Estate of Himelstein v. Ft. Wayne*, 898 F.2d 573 (7th Cir.1990); *Doe v. Klein*, 599 F.2d 338 (9th Cir.1979); *Gonzales v. Young*, 560 F.2d 160 (3rd Cir.1977). As a remedial statute, § 1983 is to be broadly construed by the courts. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). Its remedial nature makes § 1983 applicable to the full range of state violations of federally protected rights, including violations authorized by state law, violations caused by inadequate state laws, and violations resulting from a state remedy which is in practice unavailable. *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

■ Although § 1983 enables a person to bring suit against a state, state courts have concurrent jurisdiction with federal courts over 1983 actions. *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In reaffirming the appropriateness of state court jurisdiction over federal civil rights actions, the United States

---

6. 42 *U.S.C.*, § 1983 provides in pertinent part:
§ 1983. Civil action for deprivation of rights
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Supreme Court has noted that almost every state has expressly or by implication opened its courts to § 1983 suits. *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). However, there is no affirmative requirement that state courts hear such suits. *Spencer v. South Carolina Tax Com.*, 281 S.C. 492, 316 S.E.2d 386 (1984), aff'd by an equally divided court, 471 U.S. 82, 105 S.Ct. 1859, 85 L.Ed.2d 62 (1985).

Thus, § 1983 makes it possible to have a full-scale trial on the issue of state deprivation of an individual's federal rights. In contrast, the statute governing appeals of decisions from the New Castle County Board of Assessment Review provides for a procedure narrowly tailored to consideration of the amount of an assessment affixed by the Board to a piece of property. The appellate process and the authority of this Court are specifically limited as follows:

> The appellant shall be heard on the record and proceedings of each board of assessment ... which shall be certified to the Court by such body.... The Court may permit the appellant or each board of assessment ... to present any new or different evidence pertinent to the matter. The Court may affirm, reverse or modify the decision of such body and the decision of the Court shall be final.

9 *Del.C.*, § 8312(c). Thus, in reaching a decision regarding a property assessment, this Court considers the record below, supplemented by any other pertinent evidence offered by the parties. Based on the statutory language, this Court has no doubt that the General Assembly contemplated an administrative appeal process that is both highly structured and carefully focused on the assessment methodology. Although nothing prevents an appellant from raising constitutional issues as part of this process, the statutory limits of § 8312(c) do not allow for the many procedural avenues and safeguards available in a civil trial. The statute defines

the substance of the issues on appeal as well as the procedure. At the Court's discretion, the parties are permitted to present further evidence on the "pertinent matter." This pertinent matter is the amount of the property assessment as decided by the Board; it is not the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws ..." contemplated by 42 *U.S.C.* § 1983. Thus both the procedure and the substance of an appeal from a decision of the Board of Assessment Review are defined by narrow limits which preclude the hearing of a civil suit under § 1983.

■ In addition, when this Court acts in its appellate capacity on an appeal from an administrative board, the Court will not consider issues not raised before the tribunal. *Wilmington Trust Co. v. Conner*, Del.Supr., 415 A.2d 773, 781 (1980). The jurisdiction of the New Castle County Board of Assessment Review is governed by 9 *Del.C.*, § 1305 and does not authorize the Board to hear civil suits against the County. Thus, this Court holds that the appellant could not have presented this claim to the Board and also cannot appropriately join it with the instant appeal.

■ Since the appellant's § 1983 claim is not properly before this Court, it will not be considered as part of this appeal, and the appellee's Motion to Strike is rendered moot.[7]

## CONCLUSION

■ In regard to the issues raised on appeal, this Court finds the reasoning of the *Three Hundred* Court to be instructive: when the Board of Assessment Review ignores competent evidence of overvaluation and adopts the County's position without explaining its decision, the result is fundamentally unfair to the taxpayer. *Three Hundred Delaware Avenue Associates v. Board of Assessment Review, supra* at 4. As required

---

**7.** The Court also notes that whereas § 1983 provides a cause of action for violations of federal statutory or constitutional law, *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), the appellant bases its claim on the right to uniform taxation guaranteed by the Delaware Constitution. Del. Const., Art. VIII, § 1.

by statute, the Board's function is to determine whether the assessment of record is correct "in light of the facts produced at [the] hearing." 9 *Del.C.,* § 1305(2). This it has failed to do.

██ Furthermore, the Board may not ignore competent evidence of overvaluation based on the capitalization of income method supported by either of the other two accepted methods of valuation. *Seaford Associates, L.P. v. Board of Assessment Review,* 539 A.2d at 1049. In this regard, too, the Board in the case *sub judice* has erred. Using the income approach, Tatten produced competent and well-documented evidence that the property's value, expressed in 1983 terms, fell in a range from $25.6 million to $31.3 million. Tatten supported these figures with a cost approach value of $31,980,000 and a market approach range from $31.9 to $33.4 million in 1983 terms. This Court holds that Tatten carried its statutory burden of proof in showing that the Board acted arbitrarily, capriciously and contrary to law in ignoring the competent evidence of overvaluation and in adopting the County's position without consideration of the factors or explanation of its decision. 9 *Del.C.,* § 8312(c); *Three Hundred Delaware Avenue Associates v. Board of Assessment Review, supra* at 4.

For the foregoing reasons the decision of the Board is therefore set aside and the assessment of the property is modified to $31.3 million in 1983 terms, reflecting the parties' accord on the efficacy of the capitalization of income approach to valuation and the uncertainty of the market approach. *See also Seaford Associates, L.P. v. Board of Assessment Review,* 539 A.2d at 1048.

### ON MOTION FOR REARGUMENT

This 19th day of October 1993, the Court has before it Tatten's Motion for Reargument, filed pursuant to Super.Ct.Civ.R. 59(e). The motion presents two grounds for reargument. First, Tatten challenges this Court's refusal to allow joinder of Tatten's § 1983 suit with the appeal of the Board's decision regarding the appraisal amount. Second, Tatten seeks to be awarded attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 *U.S.C.* § 1988, contending that this Court need not reach the merits of Tatten's due process claim in order to award fees, as long as Tatten has prevailed on its state law claim.

*Joinder of § 1983 Civil Rights Action With an Appeal From a Statutory Tax Board*

██ As stated previously in this opinion, this Court is satisfied that an action arising under § 1983, with all the attendant avenues and safeguards of a civil trial, is not within the Board's statutory authority nor within this Court's appellate jurisdiction. In creating both the Board of Assessment itself and the judicial appellate procedure for the review of Board decisions, the General Assembly provided taxpayers with means of redress of any inaccuracies in the Board's determinations. *See* 9 *Del.C.,* § 8312. The clear language of the statute defines the substance of the issues on appeal as well as the procedure by which this Court is to rule.

In its motion for reargument, Tatten maintains that the fact that the Board lacks jurisdiction over § 1983 claims should not preclude Tatten from raising such claims on appeal to this Court. In support of this contention Tatten argues that not joining such claims will result in "piecemeal litigation." However, a review of the pertinent cases reveals that the federal and state courts which have addressed this question have focused on a different issue. The United States Supreme Court in *Fair Assessment In Real Estate v. McNary,* 454 U.S. 100, 105, 102 S.Ct. 177, 180–81, 70 L.Ed.2d 271 (1981), held that just as injunctive actions in federal court against state tax administration are barred by the Tax Injunction Act,[8] actions against state tax administrators for monetary

---

8. The Tax Injunction Act of 1937 provides that:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of

damages are barred in federal court by the principle of comity.[9] The Court found that by enacting the Tax Injunction Act Congress made clear its belief that state fiscal stability is best maintained without federal scrutiny of state tax laws. *Id.* at 102, 103, 102 S.Ct. at 179, 180. As a foundation for its holding, the Court carefully enunciated its concerns about judicial intervention in state tax schemes:

> ... [W]e are convinced that a determination [by the court that the administration of the county tax system violated the petitioner's constitutional rights] would be fully as intrusive as the equitable actions that are barred by principles of comity. Moreover, the intrusiveness of such § 1983 actions would be exacerbated by the nonexhaustion doctrine of *Monroe v. Pape.* Taxpayers such as petitioners would be able to invoke federal judgments without first permitting the State to rectify any alleged impropriety.

In addition to the intrusiveness of the judgment, the very maintenance of the suit itself would intrude on the enforcement of the state scheme. As the District Court in this case stated:

> To allow such suits would cause disruption of the state's revenue collection systems equal to that caused by anticipatory relief. State tax collection officials could be summoned into federal court to defend their assessments against claims for refunds as well as prayers for punitive damages, merely on the assertion that the tax collected was willfully and maliciously discriminatory against a certain type of property. Allowance of such claims would result in this Court being a source of appellate review of all state property tax classifications. (Footnote and citations omitted.)

*Id.* 454 U.S. at 113, 102 S.Ct. at 184. Furthermore, the Court stated that "[s]uch taxpayers must seek protection of their federal rights by state remedies, provided, of course, that those remedies are *plain, adequate, and complete....*" (Emphasis added.) *Id.* at 116, 102 S.Ct. at 186.

Since *Fair Assessment,* the concept of a "plain, adequate and complete" remedy has been the cornerstone upon which state courts have founded their decisions to disallow challenges to state taxation in state court. The current majority view is aptly summarized as follows:

> We join the consensus of other state courts that a Section 1983 challenge to state tax administration is not maintainable if state remedies afford the taxpayer an opportunity for full and adequate relief. Both Congress, by enacting the Anti–Tax Injunction Act, and the Supreme Court, by its holding in *Fair Assessment,* prohibiting or declining to exercise jurisdiction, have decided that federal interests are not advanced by allowing federal causes of action to intrude upon a carefully formulated state system designed to rectify state tax disputes. Since federal courts decline to exercise jurisdiction because federal intrusion in state tax schemes is unwarranted, state courts should also not interfere, because its enforcement of Section 1983 is no less intrusive or disruptive than if enforced by a federal court. (Footnote omitted.)

*Greenwich Township v. Murtagh,* 144 Pa. Cmwlth. 624, 601 A.2d 1352, 1356 (1992). *See also Linderkamp v. Bismarck School District No. 1,* N.D.Supr., 397 N.W.2d 76 (1986); *Spencer v. South Carolina Tax Commission,* 281 S.C. 492, 316 S.E.2d 386 (1984), *aff'd mem.,* 471 U.S. 82, 105 S.Ct. 1859, 85 L.Ed.2d 62 (1985); *Johnston v. Gaston*

any tax under state law where a plain, speedy and efficient remedy may be had in the courts of such state.
28 *U.S.C.* § 1341.

**9.** The *Fair Assessment* Court cited the explanation of comity propounded in *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971):

> [T]he notion of 'comity,' ... is a proper respect for state function, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways....

*County,* 71 N.C.App. 707, 323 S.E.2d 381 (1984), *appeal denied,* 329 S.E.2d 392, 329 S.E.2d 392 (1985); *Zizka v. Water Pollution Control Authority,* 195 Conn. 682, 490 A.2d 509 (1985); *Davis v. City of Elkhorn,* 132 Wis.2d 394, 393 N.W.2d 95 (1986); *Nutbrown v. Munn,* 311 Or. 328, 811 P.2d 131 (1991); *Hogan v. Musolf,* 163 Wis.2d 1, 471 N.W.2d 216 (1991); *L.L. Bean, Inc. v. Bracey,* Tenn. Supr., 817 S.W.2d 292 (1991).[10]

Of the two state courts which have held that a § 1983 claim regarding state tax administration is viable despite state remedies, one court failed to address the issue of a "plain, adequate, and complete" state remedy, basing its holding simply on the inapplicability of the principle of comity to state courts. *Burrell v. Mississippi State Tax Commission,* Miss.Supr., 536 So.2d 848 (1988). In the other state court decision upholding such suits, the trial court found that the interaction of the speedy remedy requirement and "New Jersey's insistence upon procedural efficiency" required joinder

of the state and federal claim. *Bung's Bar & Grille, Inc. v. Florence Township,* 206 N.J.Super. 432, 502 A.2d 1198, 1215 (1985). Thus the result in *Bung's Bar* is not inconsistent with the majority position based on a "plain, adequate and complete" remedy.[11]

After full consideration of the first prong of Tatten's motion for reargument, this Court persuaded by both *Fair Assessment, supra,* and *Greenwich, supra,* to reiterate its holding that in Delaware a civil rights action under 42 *U.S.C.* § 1983 is not a proper appendage to an appeal to the Superior Court from a decision of the New Castle County Board of Assessment Review. Thus Delaware joins the majority of state courts which addressed and laid to rest this issue.

### Attorney's Fees

█ Tatten's second ground for reargument is that this Court should award Tatten attorney's fees pursuant to the Civil Rights Attorney's Fees Award Act of 1976, which provides as follows:

**10.** In reference to administrative areas other than taxation, three of the Circuit Courts of Appeal have held that under certain circumstances, the existence of effective state remedies can prevent a plaintiff's § 1983 action from going forward. In *Cohen v. City of Philadelphia,* 736 F.2d 81 (3d Cir.1984), the Third Circuit held that when a police officer, by his own inaction, waived existing state remedies for his unwarranted discharge, the fact that such remedies existed was fatal to his contention under § 1983 that the state had deprived him of property without due process of law. The court reasoned as follows:

We thus join the First and Seventh Circuits in holding that *substantive mistakes by administrative bodies in applying local ordinances do not create a federal claim so long as correction is available by the state's judiciary.* Any other holding would lead to the danger that:

any plaintiff in state court who was asserting a right within the broadly defined categories of liberty or property and who lost his case because the judge made an error could attack the judgment indirectly by suing the judge under section 1983. That would be an intolerable interference with the orderly operations of the state courts. Due process is denied in such a case only if the state fails to provide adequate machinery for the correction of the inevitable errors that occur in legal proceedings.... (Emphasis added.)

*Cohen v. City of Philadelphia,* 736 F.2d at 86. *See also Albery v. Reddig,* 718 F.2d 245 (7th

Cir.1983) (finding that the complaint "asks the federal courts to correct substantive mistakes that may have been made in applying local ordinances in the early stages of the zoning process. The allegedly negligent errors in applying local law do not violate the plaintiffs' due process rights as long as adequate state procedures are available to remedy those errors."); *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 823 n. 9 (1st Cir.1982) ("[W]here—as here—the state has erected a complex statutory scheme and provided for avenues of appeal to the state courts, property is not denied without due process simply because a local planning board rejects a proposed development for erroneous reasons or makes demands which arguably exceed its authority under the relevant state statutes."), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *Roy v. City of Augusta, Maine,* 712 F.2d 1517 (1st Cir.1983) (finding that "[e]ven where (administrative) errors are extreme, they do not implicate the basic adequacy of the state's process, *especially when correction is available by the state's judiciary.*" (Emphasis added.).

**11.** In the case at bar, Tatten has not challenged the adequacy of the remedy for a Board error, but rather the actions of the Board in delaying the hearing and refusing to lower the assessment amount. Since Tatten does not argue that the judicial remedy is not "plain, adequate and complete," this Court need not reach that issue.

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees as part of the costs.

42 *U.S.C.* § 1988. The Delaware Supreme Court, in reference to this provision, has stated that when a case is determined on the basis of state law, "the question becomes whether disposition of the case on State law enabled the Court to avoid decision on 'substantial' constitutional questions." *Slawik v. State,* Del.Supr., 480 A.2d 636, 640 (1984). Furthermore, "[t]he substantiality doctrine of *Hagans v. Lavine* requires that [the plaintiff] establish a constitutional claim of sufficient substance to support jurisdiction in a federal court." *Id.* at 641.[12]

Tatten argues that any claim is substantial unless it is "absolutely devoid of merit," "wholly insubstantial," "obviously frivolous," "plainly insubstantial," or "no longer open to discussion." *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). However, these phrases, which originated in three different cases, lose at least part of their meaning (and hence most of their usefulness) when extracted from the context in which they arose. A review of the pertinent cases is therefore a critical requisite to understanding the standard and applying it appropriately to the case at bar. First is *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 30 S.Ct. 326, 54 L.Ed. 482 (1910), wherein the plaintiff challenged the constitutionality of a state law which required that the custodian of alcoholic beverages pay taxes on the goods. The Court held that since the decision of the state court affirming the validity of the law on state law grounds was binding

on the Supreme Court the plaintiff's "contentions to the contrary are so *devoid of merit* as to present no substantial Federal question." (Emphasis added.) *Id.* at 294, 30 S.Ct. at 330. In this context, the phrase "devoid of merit" refers to an issue over which the Court simply did not have jurisdiction.

Second, the petitioner in *Ex Parte Poresky,* 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933), challenged the constitutionality of a state law requiring him either to post bond of $500 or obtain insurance in order to register a motor vehicle. The district court had dismissed the complaint for lack of jurisdiction, since there was neither diversity nor a "substantial federal question." *Id.* at 31, 54 S.Ct. at 4. The Supreme Court stated that a "question may be plainly insubstantial, either because it is *'obviously without merit'* or because 'its unsoundness ... results from the previous decisions of this court as to foreclose the subject....'" (Emphasis added.) *Id.* at 32, 54 S.Ct. at 4. The *Poresky* Court did not enumerate which claims are "obviously without merit" but merely cited to the *Hannis* line of cases, which raised issues that had been settled on state law grounds and were therefore not properly raised in federal court.

Finally, in *Bailey v. Patterson,* 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), the plaintiffs brought suit in district court, alleging that their constitutional rights to non-segregated transportation service had been denied to them under color of state law. The Supreme Court held that the unconstitutionality of such laws had been determined by its earlier decisions, rendering the constitutional issue "essentially fictitious" and "legally speaking nonexistent." *Id.* at 33, 82 S.Ct. at 551. These phrases signify that the issues were not properly before the Court because they had already been settled.

---

**12.** The Court notes at the outset of this discussion that in Delaware even if Tatten's § 1983 claim met the substantiality test and was properly before this Court, awarding attorney's fees would be an unjust result. *Wilmington Materials, Inc. et al. v. The Town of Middletown, Delaware, et al.,* Del.Ch., C.A. No. 10392, Jacobs, V.C., 1993 WL 280411 (July 20, 1993) (denying

plaintiff's motion for attorney's fees pursuant to 42 *U.S.C.,* § 1988, where the plaintiff is a large commercial entity not in actual financial need, as contemplated by the statute, and where awarding fees would result in virtually automatic fee-shifting in every suit against a state agency when the prevailing plaintiff pleaded a constitutional violation that meets federal pleading requirements.)

These cases suggest that while Tatten's civil rights claim is not frivolous or fictitious, neither is it substantial in the practical sense implied by the *Hagans* Court and the cases cited therein. A review of those cases reveals that the function of the substantiality test is simply to facilitate the determination of whether a claim is properly before a court. On that same practical level, this Court's holding that a § 1983 claim is not a proper part of an appeal from a decision of a statutory tax board is fatal to Tatten's contention that its civil rights claim meets the requirements of the *Hagans* substantiality test. For if the claim is not properly before the Court, by definition it also cannot be substantial, at this time and under these procedural circumstances.[13] Any other conclusion would be contrary to both reason and law.

In other words, based on the *Hagans* substantiality test and this Court's holding that Tatten's § 1983 claim is not a proper appendage to an appeal from the Board, it must follow that Tatten's civil rights claim is not sufficiently substantial to warrant the award of fees under the Civil Rights Attorneys Fees Award Act of 1976, 42 *U.S.C.* § 1988.

For all the foregoing reasons, Tatten's Motion for Reargument is Denied.

It Is So ORDERED.

---

**13.** As noted by the *Fair Assessment* Court, an unhappy taxpayer who has pursued all the appellate avenues available to him in state court "may ultimately seek review of the state decisions in this Court." *Fair Assessment in Real Estate v. McNary,* 454 U.S. at 116, 102 S.Ct. at 186.