# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | | |
|---|---|---|
| 1313 OWNER LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. N19A-05-006 DCS |
| | ) | |
| NEW CASTLE COUNTY | ) | |
| OFFICE OF FINANCE, | ) | |
| ASSESSMENT DIVISION, | ) | |
| and NEW CASTLE COUNTY | ) | |
| BOARD OF ASSESSMENT | ) | |
| REVIEW, | ) | |
| | ) | |
| Appellee. | ) | |

Submitted: October 14, 2019
Decided: January 30, 2020

*Upon Appeal from the New Castle County Board of Assessment Review–*
**REMANDED.**

## OPINION

Thomas P. McGonigle, Esquire, and Sawyer M. Traver, Esquire, Attorneys for Appellant.

Adam Singer, Esquire, and Nicholas J. Brannick, Esquire, Attorneys for Appellees.

**STREETT, J.**

## Introduction

This appeal involves 1313 Owner LLC (the "Appellant")[1] that purchased 1313 North Market Street, Wilmington, Delaware (the "1313 Property"), a multi-tenant office building (formerly known as the Hercules Building), in 2017. Shortly thereafter, Appellant petitioned New Castle County Office of Finance (the "County") for a reduction in the 1313 Property's assessed value. Appellant believes that the property, situated in Wilmington's Central Business District (the "CBD"),[2] is overvalued relative to other commercial properties in the CBD and in consideration of several of the property's internal and external factors.[3]

The 1313 Property had been assessed at $41,000,000.00 in 2012 for its property tax assessment in an agreement between the property's prior owners and the County.[4] Appellant appealed the County's $41,000,000.00 assessment to the

---

[1] Appellant is a Delaware limited liability company that continues to own the 1313 Property.

[2] Appellant contends that the taxes on the 1313 Property "are much higher than competing properties, making it difficult [for the 1313 Property] to compete [with competing properties]." Appellant's Opening Brief, at 4-5.

[3] Appellant also contends that the building has an unusual layout, a high vacancy rate, the core of the CBD is shifting closer to downtown Wilmington, and there is a growing vacancy rate in the CBD. Appellant asserts that the combination of these factors lower the 1313 Property's fair market value.

[4] This assessed value represents the County's estimate of the 1313 Property's fair market value as of July 1, 1983. All New Castle County property assessments are based upon July 1, 1983 property values (the date of the last county-wide assessment). The Delaware Chancery Court has recently explained that, even though "[p]roperty values have dramatically changed since the 1970s and 1980s," Delaware Counties "have locked in the relative valuations that existed in 1987 [Kent County], 1983 [New Castle County], and 1974 [Sussex County]." *Delawareans for Educational Opportunity v. Carney*, 2018 WL 4849935, at *2 (Del. Ch. Oct. 5, 2018).

1

New Castle County Board of Assessment Review (the "Board") and requested that the assessment be reduced to $21,900,000.00. The Board denied Appellant's appeal.

Appellant now asks this Court to reverse the Board's decision. Appellant claims that the Board acted arbitrarily and capriciously by allegedly ignoring Appellant's competent evidence despite the absence of rebuttal evidence from the County.[5] Appellant also asserts that the Board's decision violated Delaware's Freedom of Information Act ("FOIA") and Appellant's due process rights.[6]

The Court finds that the Board did not consider the impact of a high vacancy rate on the 1313 Property's fair market value and, therefore, remands the matter to the Board.[7]

---

[5] Appellant contends that it presented evidence relating to "estimated actual rent." Appellant also contends that it presented testimony on the costs of stabilizing the property to achieve a vacancy rate of 15% (which is said to be the typical vacancy rate for a commercial business in a normal year).

[6] Appellant asserts a FOIA claim alleging that the Board's written decision does not comport with the Board members' stated rationales at the hearing. Appellant also asserts a due process claim alleging that the Board's rules did not protect Appellant's due process rights, allowed surprise witnesses to testify at the hearing, and considered evidence not in the record.

[7] The Court finds that the Board provided reasons for rejecting Appellant's estimated actual rent evidence and, therefore, did not act arbitrarily and capriciously. The Court also finds that the Board did not violate FOIA or Appellant's Due Process rights. *See, infra* at pp. 27-32.

2

## Statement of Facts

In 1982, the 1313 Property building was constructed to house Hercules Inc.'s corporate headquarters.[8] In 2005, DCL Partners purchased the 1313 Property,[9] with Hercules Inc. staying as the anchor tenant until 2013.[10] In 2012, the County, by agreement with DCL Partners, assessed the 1313 Property at a value of $41,000,000.00 ($11,717,600.00 for the land and $29,282,400.00 for the building).[11] DCL Partners spent approximately $15,000.000.00 on improvements to the building.[12]

In 2017, Appellant purchased the 1313 Property at a foreclosure auction.[13] Appellant subsequently spent approximately $6,000,000.00 on improvements to the building.[14]

---

[8] The record does not reflect the assessed value of the property when the county-wide assessment was made in 1983.

[9] The record indicates that DCL Partners purchased the property for $56,000,000.00 plus $44,000,000.00 in assumed debt – the record also indicates that the total investment made by DCL Partners at the time of purchase was approximately $119,000,000.00. Board Hearing Transcript, at 21-35, 37, 101-03, 112.

[10] Hercules Inc. maintained a master lease on the property until 2013, when it ceased to be a tenant. *Id.* at 27.

[11] In 2011 and 2012, DCL Partners filed assessment appeals that were resolved consensually with the County for the current assessment amount of $41,000,000.00. *Id.* at 34-35.

[12] The 1313 Property building was fully renovated in 2013. *Id.* at 37.

[13] Appellant purchased the 1313 Property for $22,900,000.00 (the foreclosing lenders gave up approximately $65,000,000.00 in debt during the auction process). *Id.* at 102-05.

[14] *Id.* at 35.

3

On March 22, 2018, Appellant appealed the County's 2012 assessment to the Board. Appellant requested that the assessed value of $41,000,000.00 be reduced to $21,900,000.00 ($3,620,000.00 for the land and $18,280,000.00 for improvements).

In April 2019, the 1313 Property had twenty-two tenants,[15] an approximately 33% vacancy rate, and three food vendors.[16] Appellant's expert witness also testified that the 1313 Property has only 80% rentable space due to a large atrium in the middle of the building and because the building was originally built to house a single tenant.[17] The expert witness testified that most commercial buildings have 90% rentable space.[18]

## Procedural History

On April 17, 2019, the Board held a hearing on Appellant's appeal. Scott Johnson (a partner in McConnell Companies and a broker for the 1313 Property)[19]

---

[15] The tenants include several law firms. *Id.* at 37. The 1313 Property also contains a parking lot with 138 spaces that is operated by the Wilmington Parking Authority ("WPA"). The 1313 Property does not earn income from the parking lot. The WPA lease runs until approximately 2033. *Id.* at 25

[16] *Id.* at 30, 37.

[17] The bulding has twelve stories and 650,000 gross square feet. It has between 517,325 and 530,867 square feet of rentable space and is located on approximately 2.6907 acres of land in Wilmington, Delaware.

[18] *Id.* at 55-57.

[19] Mr. Johnson testified that McConnell Johnson provides services for 1313 Owner and that 1313 Owner is a separate LLC from McConnell Johnson. *Id.* at 22. He testified that he worked for the owner of the 1313 Property beginning in the fall of 2017. *Id.*

and Robert McKennon (a commercial real estate appraiser focused on New Castle County)[20] testified on behalf of Appellant. Steven Hopkins (a commercial real estate appraiser)[21] and Jeff Sayer (the Property Assessment Administrator for the County) testified on behalf of the County.

Mr. Johnson testified that the 1313 Property was built as a single-tenant building with "a lot of extra spaces in the building that aren't necessarily leasable in the multi-tenant market, which is what the building has been converted to do after Hercules had left."[22] He also testified that the building only has 138 parking spaces, which are not controlled by the property.[23]

In addition, Mr. Johnson testified that the 1313 Property had an occupancy rate of 55% [a 45% vacancy rate] when Appellant first owned the building and that the occupancy rate had increased to 66% [an approximately 33% vacancy rate] at the time of the hearing.[24] Mr. Johnson also testified that the 1313 Property is

---

[20] Mr. McKennon is the owner and president of Appraisal Associates, Inc. *Id.* at 45.

[21] Mr. Hopkins is employed with Delaware Appraisal Group and is licensed as a Certified General Appraiser in Delaware. *Id.* at 133.

[22] Mr. Johnson stated that the building has an 8,000-square-foot atrium. He also testified that the floor plate of the building (43,000 square feet) is not the typical size for a multi-tenant building (20,000 square feet). *Id.* at 24-25.

[23] Mr. Johnson stated that the Wilmington Parking Authority controls the parking lot until approximately 2033. *Id.* at 25. *See* fn. 15.

[24] Mr. Johnson testified that the building's average occupancy rate has been 62% under Appellant's ownership. *Id.* at 29-31, 36.

competing over a "finite" pool of tenants in the CBD[25] and speculated that the CBD's vacancy rate will increase to approximately 30% when space vacated by Bank of America in the Bracebridge complex becomes available on the market.[26]

Mr. Johnson also testified that there is a "roughly" 12% market factor charged to tenants for common areas.[27] This 12% charge is in addition to the rental rate charged to tenants.

Mr. McKennon estimated the market value of the property on July 1, 1983.[28] He said that he determined the market value of the 1313 Property by using period

---

[25] Mr. Johnson explained that there has been no increase in the number of tenants in the CBD since 2011. *Id.* at 43-44, 234-36.

[26] Appellant's other witness, Mr. McKennon, later testified that the current CBD vacancy is approximately 24%. *Id.* at 70.

[27] Mr. Johnson testified that "[w]e charge a market factor, and market factor is about 12 percent." A Board member asked Mr. Johnson whether the market factor applies to all of the comparables he used in his income approach (the Board member asked: "are all of the comps the same way[?] I can quote $12 a square foot, but in actuality I'm paying maybe 12.25 a square foot because I'm paying for part of the common area."). Mr. Johnson replied: "And that's accurate…we have bathrooms, those common things that aren't buildable penetrations throughout the building, okay. So then what we do is there is a market factor for every building basically that's adding those on, and that's roughly around 12 percent." *Id.* 218-20.

[28] Mr. McKennon testified that he considers the 1313 Property to be a Class A building but does so with some caution "due to the size and some of the issues that the convergence of the corporate to a multi-tenant building brings." *Id.* at 56. He stated that the 1313 Property has 80% leasable space, while commercial buildings normally have 90% leasable space. *Id.* at 56-57. He explained that the 1313 Property, unlike competing properties, incurs costs for heating and maintaining the entire building even though only 80% of the building is leasable and that this creates higher operating costs than what is typical for a commercial building. *Id.* at 57, 63. In addition, the layout of the building resulted in less windows per leasable space (which makes the building less attractive to tenants). *Id.* at 63-64. He also explained that the location of the CBD has shifted away from the 1313 Property area to another part of Wilmington and that it is no longer located in the core CBD. *Id.* at 57-58, 60-61. Furthermore, Mr. McKennon stated that currently "[t]here's no market for office spaces." *Id.* at 67. He also testified that the 1313 Property has inadequate

6

sales data of office building-type property, period sales data of land in the CBD that was purchased for commercial development, cost indexes, income from the standpoint of other CBD buildings, and the current status of the real estate market in the CBD.[29]

Mr. McKennon then applied the three recognized methods for valuation of real property: comparable sales, cost, and income.[30] Under the comparable sales analysis,[31] Mr. McKennon compared the 1313 Property to three sales within the CBD that occurred between 1981 and 1983.[32] These properties were Class "B" multi-story, multi-tenant office buildings that were substantially smaller than the 1313 Property and in inferior condition (Mr. McKennon stated that these buildings

---

parking. *Id.* at 65. However, he stated that the building is in "very good condition," is well-maintained, and the owners have made "a number of [necessary] capital improvements." *Id.* at 64-65.

[29] Mr. McKennon stated that the only difference between the appraisal of the 1313 Property and a standard appraisal (Mr. McKennon did not define a standard appraisal) was that the 1313 Property appraisal was retroactive due to New Castle County's 1983 retroactive requirement. *Id.* at 51-52.

[30] *Id.* at 51.

[31] Mr. McKennon explained that the comparable sales approach is "where you look at sales of other, as similar as you can find, type properties and compare them to the property you're appraising." He stated that the disadvantage of this approach, in this case, is that the 1313 Property building is "a very unusual building." *Id.* at 73.

[32] *Id.* at 73-74. Mr. McKennon did not compare the 1313 Property to properties assessed after 1983. He explained that he used these three buildings because "they were the closest [sales] [he] could find in terms of they occurred before the valuation date" and "[t]hey were all Central Business office buildings in the relevant timetable, and they were properties that were available on the market for rent." *Id.* at 74-75.

had to be "adjusted upward significantly").[33]  Using this approach, Mr. McKennon determined that the current value of the 1313 Property was between $26.4 and $30.5 million.[34]

Mr. McKennon next assessed the property under the cost approach which is based on consideration of the value of the land, the replacement cost of a new building, and depreciation.[35]  He used two methods to determine depreciation – a combination of the market extraction method[36] and an age-life technique.[37]  He also

---

[33] *Id.* at 73-75.  One building was approximately 90,000 square feet and another was approximately 108,000 square feet.

[34] Mr. McKennon stated that this amount assumed a vacancy rate of 15%.  *Id.* at 78.

[35] Mr. McKennon explained the cost approach analysis:

> [The analysis] start[s] with the value of the underlying land and estimate[ing] the value of the land based on its highest and best use.  And then you estimate what the cost to build the building new would be, and you apply depreciation factor to that.  You add the depreciated value of the improvements to the land value.

*Id.* at 80.  Mr. McKennon stated that the disadvantage of this approach is that it can be difficult to estimate depreciation.  *Id.* at 81.

[36] Mr. McKennon explained that the market extraction method is:

> [L]ooking at, at other buildings that have recently sold.  And if you apply a cost to build that building, you can, you can come up with and back into an estimate of how much depreciation that's had, and that was used in part in this example.

*Id.* at 85.

[37] He explained that the age-life method is:

> [F]iguring out what the normal economic life of the building is going to be and what's its effective age.  And it's a division process.  It's got an effective age of X, so it's got so long to live, so devising, division problem.

*Id.*

8

relied on three comparables that required him to make adjustments.[38] He explained that he was able to "come up with estimates for physical deterioration" and account for external obsolescence[39] by examining these comparables.[40] Using this approach, Mr. McKennon arrived at an current value of $32.1 million.[41]

The third approach, the income approach, is determined by analyzing the potential income and expenses from income producing property. Mr. McKennon testified that he gave primary consideration to the income approach[42] because the property is an income-generating property.[43] In conducting his income analysis, Mr.

---

[38] *Id.* at 82-83. Mr. McKennon's appraisal report shows that these three comparables were different than the comparables he used for his sales comparison approach. Record, at 55. These buildings were 50,800 square feet, 71,000 square feet, and 349,000 square feet. *Id* at 56-58.

[39] Board Hearing, at 72. External obsolescence involves issues that affect the property's value that are outside of the property, such as a poor market for office buildings.

[40] *Id.* 86.

[41] *Id.* 90. This figure is higher than the amount requested at appeal ($21,900,000.00).

[42] Mr. McKennon explained that under the income approach:

> [Y]ou look at what the property would rent for in the open market, what kind of income it would generate. And from that you take out a stabilized vacancy factor in this case. You also take out operating expenses, normal operating expenses on a year-to-year basis, not just one isolated good or bad year, but what you'd expect over the normal life of the building. And deducting that's going to give you a net operating income for the building, and you apply a capitalization rate to that....

*Id.* at 90-91.

[43] *Id.* at 99.

McKennon relied on comparables.[44] He stated that he determined the gross potential income by "[l]ook[ing] at what other properties were renting for on the open market."[45] He explained that his report lists the comparable buildings' "quoted rent" and their "actual estimated rent."[46] He stated that there was an approximately 15% difference between the quoted rental rate and actual rent (the actual rental rate was lower than the quoted rental rate).[47] Mr. McKennon estimated that the 1313 Property's gross rental area income is $13.00 per square foot resulting in a property value of $29 million.[48]

Mr. McKennon then reduced this value to an "as is" value of $21.9 million to reflect the costs that would be necessary to "stabilize"[49] the 1313 Property to achieve

---

[44] *Id.* at 92. Mr. McKennon stated that he had rent rolls for "a couple" of the properties from around 1983 and that "some of them [are] actually based on leases in the property at that time." *Id.* at 119. He also stated that he talked to brokers who were operating in 1983 and that there was a difference of about 15% between quoted rent and actual rent. *Id.* at 119-20. Mr. McKennon conceded that he did not know the actual rent that Hercules had paid on the 1313 Property. *Id.* at 120. Mr. McKennon's appraisal lists thirteen (13) buildings (comprised of Class A and Class B office spaces in the CBD) with his "estimate[s]" of the buildings' "actual rental levels for leases being negotiated at that time [1983], reflecting a discount of 15% from the rates being quoted at the time [1983]." Record, at 76.

[45] Mr. McKennon explained that "[g]ross potential income is the amount per square foot that you get applied to the net rentable area." Board Hearing, at 91.

[46] *Id.* at 92.

[47] *Id.* at 119-20.

[48] *Id.* at 94, 97-98.

[49] Mr. McKennon explained that a property's vacancy rate is considered stabilized when it is at 15%.

10

a vacancy rate of 15%[50] which is the normal vacancy rate in a normal market.[51] He stated that stabilizing a property to achieve a 15% vacancy rate requires costs and risks.[52] He believed that it would take four years for the 1313 Property to reach a vacancy rate of 15%.[53]

The Board found that Appellant had presented competent evidence of substantial overvaluation to rebut the presumption that the County's assessment was correct.[54]

The County then presented rebuttal testimony in support of the assessment. Mr. Hopkins testified on behalf of the County. In his opinion, some of Mr. McKennon's analyses were unreliable. He stated that he did not agree with Mr.

---

[50] *Id.* at 105.

[51] *Id.* at 53. Mr. McKennon testified that at the time of the 1313 Property's construction, the city had a typical vacancy level of 14% to 15%. *Id.* at 69. In making this determination, he relied on reports from area brokers from 1983. *Id.* at 107. He stated that the current average vacancy rate in the CBD is 24% and that the average has been near 20% for "about the past decade." *Id* at. 70. He speculated that the CBD's vacancy rate would not improve in the near future and that space that was previously occupied by Bank of America (the Bracebridge property) has recently been put on the market (Mr. McKennon also believed that the Bracebridge property would be more attractive to tenants than the 1313 Property because the Bracebridge property had more parking spaces). *Id.* at 70-71.

[52] *Id.* at 53-54. Mr. McKennon did not elaborate on the costs and risks.

[53] *Id.* at 101.

[54] *Id.* at 104. Because the Board found that Appellant presented competent evidence to overcome the presumption that the assessment was accurate, the County was then required to present a rebuttal. *Jones v. Board of Assessment Review of New Castle County*, 1987 WL 12442, at *1 (Del. Super. June 5, 1987) ("Once appellant meets its initial burden of coming forward with evidence of overvaluation, the burden shifts to the County to rebut such evidence.").

11

McKennon's comparable sales analysis because there were better comparables than those used by Mr. McKennon[55] and that the use of estimated actual rent in his income analysis deviated from typical commercial appraisals that "us[e] the actual rent, not the actual estimated rent"[56] (although he agreed that normal vacancy rates in 1983 were 10% – 15%).[57]

Mr. Sayers testified that his (Sayer's) comparable sales analysis differed from Appellant's and resulted in a range value from $49 million to $57 million.[58] Mr. Sayer relied on data from three properties that were closer in size to the 1313 Property than the properties used by Mr. McKennon (but were still smaller than the 1313 Property).[59]

Mr. Sayer also testified that his (Sayer's) income approach analysis, assuming both 10% and 15% vacancy rates, shows an average rent of $15.30 per square foot using quoted rent prices which was higher than Appellant's.[60]

---

[55] Mr. Hopkins testified that Mr. McKennon's "sales were a non-rental unit" and that other Class A buildings that are larger (but not as large as the 1313 Property) reflect a higher price than what Mr. McKennon's analysis showed. Board Hearing, at 136.

[56] *Id.* at 158.

[57] *Id.* at 160.

[58] *Id.* at 194.

[59] *Id.* at 193.

[60] *Id.* at 186. Mr. Sayer initially stated that value under the income approach was $44,364,485.70. However, Mr. Sayer had erroneously included income from the parking lot in his valuation (the 1313 Property does not derive income from the parking lot). Mr. Sayer testified that excluding the

At the conclusion of the hearing, the Board voted three to two and affirmed the County's assessment.

On April 29, 2019, the Board issued its written decision. The Board found that the income approach is the most relevant method for valuing an income-generating commercial property. A majority of the Board found that Mr. McKennon's income analysis relied too heavily on his calculation of estimated actual rents. The Board wrote that "[t]he Appellant failed to present persuasive testimony or other evidence to support Mr. McKennon's 15% adjustment to quoted rent to arrive at his calculation of 'actual' rent."[61] The Board also found that "Mr. Johnson testified that tenants pay not just the rent per square foot stated in their lease, but a percentage of rent for common areas and similar costs of approximately 12% which mitigates any reduction from quoted rent."[62]

In addition, the Board rejected Appellant's assertion that the value of the 1313 Property should be reduced to account for costs to achieve vacancy stabilization. The Board wrote:

> While it may be the case that the Property has a high vacancy rate currently, the Appellant acquired the Property through an auction

parking lot would reduce the income value by about 20 cents per square foot. *Id.* at 187-88. The corrected analysis yielded an income value range between $39,725,748.00 and $43,407,177.00, which the Board stated supports the County's assessment. Board Opinion, at 9.

[61] Board Opinion, at 11.

[62] *Id.*

13

process that removed over $40 million in debt and significantly lowered the Appellants' [sic] basis in the Property. The Appellant has positioned itself to generate future profits from the Property and a majority of the Board did not believe a reduction in value to stabilize the Property was necessary or appropriate.[63]

The Board also determined that application of the cost approach favored the County. The Board found there was no dispute among the parties as to physical depreciation and that the discrepancy between Mr. McKennon's and the County's calculations is "largely attributable" to Mr. McKennon's use of estimated actual rent rather than quoted rent.[64] The Board noted that replacing Mr. McKennon's estimated actual rent with quoted rent, while maintaining all of Mr. McKennon's other inputs and assumptions, results in a valuation of the Property of $41,800,000 (rounded), which is consistent with the County's assessment. The Board also wrote that the $21,000,000.00 investment in the property since 2011 supports the $41,000,000.00 assessment under the cost approach because there would be less depreciation.

Lastly, the Board rejected the applicability of the comparable sales approach in this case and did not rely on it. It found that both Mr. McKennon's and the County's comparable sales approaches were unreliable given the fact that both sides

---

[63] *Id.*

[64] *Id.*

made substantial adjustments to account for the discrepancies between the 1313 Property and the properties selected for comparison.

On May 29, 2019, Appellant filed its appeal of the Board's decision.

### The Parties' Contentions

Appellant asserts that Delaware prefers consideration of actual rent rather than quoted rent when making valuations and that Appellant, accordingly, used estimated actual rent while the County used "asking" or "quoted" rent.[65] Appellant posits that these different measures account for a $12,000,000.00 discrepancy between Appellant's valuation and the County's assessment. Appellant also asserts that the Board's conclusion that there was "no evidence or rationale to support [its] assertion that [Appellant's] reliance on actual estimated rents was too heavy" was unsupported by the record.[66]

Additionally, Appellant contends that Appellant's competent evidence of estimated actual rents was unrefuted and that the Board's failure to consider it was

---

[65] Appellant writes that its witness, Mr. McKennon, had forty-five years of experience as an appraiser, which included experience during 1983. Appellant's Reply, at 12. He "derived an adjustment range of 10-25% off the quoted rent based on his review of the actual rent for 1105 Market Street [a different property] as compared with the quoted rent on that property." Appellant's Opening Brief, at 20. Appellant also writes that the estimated actual rent "took into account the common practice at the time of leasing concessions, which he reports ranged from one to three months of free rent." *Id.*

[66] *Id.* at 22.

arbitrary and capricious.[67] Appellant writes, "the lack of any responsive evidence by the County to Mr. McKennon's competent evidence regarding actual rents, coupled with the Board's subsequent acceptance of the County's assessment value, amounts to rubber-stamping the County's assessment, which Delaware courts have found is fundamentally unfair and thus arbitrary and capricious."[68]

Appellant also claims that its stabilized vacancy argument was also unrefuted but the Board accepted the County's position without a viable explanation.[69] Appellant states that the 1313 Property "was 43% vacant as of the date of [Mr. McKennon's] appraisal" but that the County, nonetheless, assumed a stabilized vacancy rate of 15%. Appellant maintains that the estimated costs to stabilize the property to achieve a 15% vacancy rate would be $7,100,000.00 and that deducting this cost from Mr. McKennon's $29 million value of the property results in an "as

---

[67] Appellant writes that, following Mr. McKennon's testimony, the Board ruled that Appellant had presented competence evidence to overcome the presumption that the County's assessment was accurate. Appellant argues that the County was then required to present evidence to rebut Appellant's competent evidence but instead merely reasserted the quoted rent in its assessment.

[68] Appellant's Opening Brief, at 22-23.

[69] Appellant argues that the Board's reason for denying Appellant's stabilized vacancy argument (that Appellant acquired the property through an auction that removed over $40 million in debt, significantly lowered his basis in the property, and positioned Appellant to generate future profits from the property) is fundamentally flawed because a prior owner (DCL) initiated the auction process.

is" value of $21.9 million. Appellant asserts that the Board's decision not to accept his evidence of stabilization costs is fundamentally unfair.[70]

Moreover, Appellant argues, the Board's written decision must be set aside because it violates the Delaware Freedom of Information Act ("FOIA"). Appellant states that FOIA requires the Board, as a public body, to deliberate and arrive at its decisions in public. Appellant contends that the Board's written opinion differed from the Board's stated rationale at the hearing when the apparent reasons for three Board members' affirming the County's assessment were omitted from the Board's written opinion.[71] Specifically, Appellant claims that two Board members denied Appellant's appeal "in the hope that a Court-ordered (or County-initiated) reassessment will solve the problem [of having a large number of appeals]"[72] and posits that a third Board member based his decision to deny Appellant's appeal on a replacement cost analysis.

---

[70] Appellant maintains that the County did not contest Mr. McKennon's testimony on the costs related to achieving a stabilized vacancy rate (15% vacancy) and that the Board did not discuss the issue of stabilization at the hearing and did not provide a "viable explanation" in its written decision. Appellant's Opening Brief, at 25. *See* fn. 69.

[71] Appellant asserts that "the rationale principally relied upon by two of the three Board Members that voted against [Appellant] was that the proper remedy in cases such as this is to hope the County conducts a new countywide reassessment." Appellant's Opening Brief, at 26-27. Appellant argues that this rationale is not mentioned in the Board's written opinion. Appellant also writes that the third Board member's stated rationale at the hearing for denying Appellant's appeal was based on a replacement cost analysis that cannot be found in the Board's written opinion.

[72] *Id.* at 28.

In support of this claim, Appellant cites dicta from *Delaware Correctional Officers Association, et al. v. State*. Appellant quoted a passage that says "it would defeat the purposes of public deliberation if [an administrative] Board could materially alter its analysis and adopt a new theory to support the result previously announced."[73] However, that case affirmed the Board's decision. *Delaware Correctional Officers Association, et al. v. State* held that the Board did not violate FOIA because its decision was adequately supported even though specific references that the plaintiff claimed violated FOIA were excluded and, alternatively, because the written decision did not materially deviate from the oral decision.

Lastly, Appellant asserts that the totality of the circumstances of the County's and Board's actions reflect violation of due process. Appellant writes that the County waited until one week prior to the hearing to respond to Appellant's request for evidence, failed to identify its witnesses and the subject of their testimony, and failed to provide the information upon which their witnesses would rely. Appellant also alleges that the Board relied on evidence produced for the first time at the hearing and that the Board relied on evidence not in the record.[74] Appellant further

---

[73] *Delaware Correctional Officers Association, et al. v. State*, 2003 WL 23021927, at *8 (Del. Ch. Dec. 18, 2003).

[74] Appellant posits that a Board member asked Mr. Johnson whether $75.00 per square foot was a safe figure to estimate the cost of construction in 1983. The record reflects that Mr. Johnson replied: "Okay." The record does not reflect that this figure was presented as evidence by either party. Nevertheless, Appellant contends that this brief exchange with the Board member was the basis for that member's vote to deny the appeal. Appellant cites *O'Neill v. Board of Assessment*

18

argues that he was prejudiced because he could not properly prepare for the hearing and could not undertake meaningful cross-examination of the County's witnesses. Appellant contends that, even if the County followed the Board's discovery rules, the Board's rules "fall grievously short" of due process protections.[75]

The County contends that the Board's finding that competent evidence had been presented did not automatically mean that Appellant proved assessment overvaluation. Rather, it meant that there was sufficient evidence for the Board to consider and weigh competing evidence in order to reach a decision.

In addition, the County writes that Appellant presented estimates and not actual rents in its income approach analysis, failed to present evidence to support its estimated actual rents, relied on a single property that had a wide range of actual rents when making its estimation of the 1313 Property actual rents, did not disclose the number of leases it reviewed concerning that single property, and failed to account for the fact that commercial tenants pay an additional Market Factor for common areas.

The County also states that Appellant's stabilization analysis was flawed. The County writes that the 1313 Property's low vacancy is a temporary phenomenon and

_Review of New Castle County_, 1986 WL 14018, (Del. Nov. 21, 1986) (holding that the appellant was deprived of her right to effectively cross-examine and present evidence because "the figures relied upon by the Board were not formally introduced into evidence or made available to [her] prior to the hearing.").

[75] Appellant's Reply, at 22.

Delaware law does not permit temporary phenomenon to be factored into a valuation.

Concerning Appellant's income approach analysis, the County argues that such analysis was not corroborated by its sales approach or cost approach analyses. The County points out that Appellant's sales approach was flawed because the comparables were significantly smaller and in worse condition than the 1313 Property and that Appellant's cost approach was flawed because the estimated actual rent was unsubstantiated.

Furthermore, the County contends that the Board did not violate FOIA. The County writes that the Board publicly deliberated and publicly arrived at its decision, the Board's decision is supported by the record, and the Board did not convene a private meeting following the hearing. The County asserts that the Board's decision merely "articulate[d] in a more coherent and concise fashion the record developed during [the] administrative hearing."[76]

Concerning Appellant's due process claim, the County writes that due process in the context of administrative tribunals is a flexible concept; all of the County's exhibits were provided to Appellant in accordance with the Board's rules; Appellant could have requested a continuance but did not; Appellant did not ask the County to

---

[76] The County's Answer, at 25-26.

identify its witnesses; due process does not require the disclosure of witnesses prior to an administrative hearing; Appellant never requested the subject of the witnesses' testimony; and the Board did not rely on evidence not in the record.

## Standard of Review

This Court's authority to review appeals from the Board is governed by 9 *Del. C.* § 8312(c), which provides that "[t]he decision of [the Board] shall be *prima facie* correct and the burden of proof shall be on the appellant to show that such body acted contrary to law, fraudulently, arbitrarily or capriciously."[77] An appellant faces "a substantial evidential burden" before both the Board and this Court.[78] At a hearing before the Board, there is a presumption of accuracy in favor of the County's assessment.[79] That presumption can only be overcome by competent evidence sufficient to show a substantial overvaluation.[80] When the Board's decision is

---

[77] *O'Neill v. Board of Assessment Review*, 1986 WL 14018, at *1 (Del. Super. Nov. 21, 1986). *See also, Cronin v. Board of Assessment Review for New Castle County*, 1992 WL 52181, at *1 (Del. Super. Feb. 26, 1992) ("When a decision of the Board is appealed to the Superior Court, the assessment of the county is presumed to be correct and will be reversed only if the aggrieved party can show that the county acted contrary to law, fraudulently, arbitrarily or capriciously.").

[78] *Seaford Associates, L.P. v. Board of Assessment Review*, 539 A.2d 1045, 1047 (Del. 1988).

[79] *Fitzsimmons v. McCorkle*, 214 A.2d 334, 337 (1965) ("On an appeal from an assessment, a *prima facie* case of accuracy is made by the assessment record. The burden of presenting evidence to meet the *prima facie* case and to rebut the presumption rests upon the property owner").

[80] *Tatten Partners, L.P. v. New Castle County Board of Assessment Review*, 642 A.2d 1251, 1256 (Del. Super. 1993), *aff'd, New Castle County Board of Assessment Review v. Tatten Partners, L.P.*, 647 A.2d 382 (Del. 1994) ("The burden of presenting evidence to meet the prima facie case and to rebut the presumption rests upon the property owner. To fulfill the purpose, the owner's evidence

appealed to this Court, "[t]he reviewing court is not to reverse if it finds that the Board relied in part on incompetent evidence but only if the Board's findings are clearly wrong and its conclusions not the product of an orderly and logical deductive process."[81] "The Board of Assessment is presumed to have the necessary expertise to evaluate competing methods of property valuation and make an informed judgment as to which method is more persuasive."[82]

However, it is also settled law that "a quasi-judicial tribunal must state the basis for its decision in order to allow judicial review."[83] Therefore, this Court may remand a matter back to the Board "to clarify issues of fact or to make findings consistent with the Court's decision"[84] or "if the lower tribunal failed to create an adequate record to review."[85]

---

must not only be competent; it must be sufficient to show a substantial overvaluation."); *See also Delaware Racing Association v. McMahon*, 340 A.2d 837, 840 (Del. 1975).

[81] *Brandywine Innkeepers, L.L.C. v. Board of Assessment Review*, 2005 WL 1952879, at *3 (Del. Super. June 3, 2005).

[82] *Shahin v. City of Dover Board of Assessment Appeals*, 2016 WL 5407853, at *1 (Del. Sept. 27, 2016).

[83] *Reise v. Board of Building Appeals of the City of Newark*, 746 A.2d 271, 274 (Del. Super. Feb. 23, 2000).

[84] 9 *Del. C.* § 8312(c) states in pertinent part: "The Court may affirm, reverse or modify the decision of such body and the decision of the Court shall be final. The Court at its discretion may also remand the matter to the board to clarify issues of fact or to make findings consistent with the Court's decision."

[85] *See Vondrasek v. Board of Adjustment of the City of Wilmington*, 2017 WL 1735402, at *1 (Del. Super. May 1, 2017).

## Discussion

For the following reasons, this Court finds that Appellant's claims – that his estimated actual rent evidence was ignored in the absence of rebuttal evidence, that the Board's decision violated FOIA, and that Appellant's due process rights were violated – are without merit. However, this Court finds that the Board erred when it seemingly did not consider the current high vacancy rate in relation to the 1313 Property's fair market value.[86]

The "[New Castle] County Department of Finance is charged with the responsibility of assessing all property for taxation."[87] "[R]eal estate tax assessments must be based on the property's true value in money, which is the same as its fair market value."[88] Moreover, the Delaware Constitution requires uniformity in taxes.[89] To achieve uniformity, the County uses a base year of 1983 in making property assessments.[90]

---

[86] *Commerce Associates, LP v. New Castle County Office of Assessment*, 159 A.3d 1206, 1208 (Del. Apr. 11, 2017) ("New Castle County and the Board must consider *all relevant factors* bearing on what the units, in their current conditions, would have been valued at in 1983 [the base year utilized by the County to achieve uniformity].") (emphasis added).

[87] *Board of Assessment Review for New Castle County v. Stewart*, 378 A.2d 113, 116 (Del. Aug. 3, 1977).

[88] *Bailey v. Board of Assessment Review Department of Land Use*, 2004 WL 1965867, at *3 (Del. Super. Aug. 19, 2004).

[89] *Id.*

[90] *Id.*

The sales comparison approach, cost approach, and income approach are the three recognized methods of determining a property's value.[91] The income approach is the "preferred method to value income-producing properties" but "should be used in conjunction with another valuation method."[92] Under the income approach, this Court has stated that it is preferable to use actual data (such as the actual rent charged as opposed to quoted rent).[93] Where the subject property did not exist during the

---

[91] This Court has summarized the three approaches as follows:

"In the Market [sales comparison] Approach recent sales of similar properties are examined and compared to the subject property. Market oriented adjustments are made for any differences between the comparable sales and the subject property."

"The Income Approach is a method of arriving at the estimated value of the property by analyzing the potential income and expenses from income producing real estate. The net income is then capitalized to indicate the value of the property as an investment. It assumes a return based on that which competitive properties are receiving."

"In the Cost Approach, the site and improvements are treated separately for analytical purposes. By means of a market analysis, the site is valued independently as if vacant and ready to be put to its highest and best use."

"Next, the reproduction cost new of the improvements is estimated. This represents the most probable cost of building a replica structure. From this estimate is deducted all depreciation or utility loss accruing to the building."

"The depreciated cost new is then added to the total site improvements and land value to arrive at the indicated value from this analysis."

*Tatten Partners, L.P. v. New Castle County Board of Assessment Review*, 642 A.2d 1251, 1255, n. 3 (Del. Super. Oct. 19, 1993) *aff'd, New Castle City. v. Tatten Partners, L.P.*, 647 A.2d 382 (Del. Apr. 21, 1994).

[92] *New Castle County Department of Finance v. Teachers Insurance and Annuity Association*, 669 A.2d 100, 102 (Del. Oct. 24, 1995).

[93] *JMB Income Properties Ltd. Partnership-XI v. New Castle County Board of Assessment Review*, 1994 WL 45336, at *5 (Del. Super. Feb. 3, 1994).

base year (1983), or where data is not available for the property from the base year, it is necessary for appraisers "to construct a model to estimate how much income the property would reasonably have generated in 1983 [the base year]."[94]

Appellant contends that the Board should have found its income approach analysis to be more accurate than the County's income approach analysis because Appellant's expert relied on estimated actual rent, while the County relied on quoted rent. However, the record does not reflect that Appellant's expert used the 'actual rent' of the 1313 Property in making his assessment;[95] Appellant presented *estimated actual* rent.[96]

---

[94] *Tatten Partners, L.P. v. New Castle City. Board of Assessment Review*, 642 A.2d 1251, 1258 (Del. Super. Oct. 19, 1993), *aff'd, New Castle City v. Tatten Partners, L.P.*, 647 A.2d 382 (Del. Apr. 21, 1994).

[95] Although this Court has held that "[i]n cases where the building at issue was in existence during the base tax year, the preferred method for establishing an income valuation on a property is to use actual data on the specific property," Appellant did not rely on actual rental rates from the 1313 Property. *Id.*

[96] Support for Appellant's estimate is the rent of a single other building, an unsubstantiated statement by Mr. McKennon that rent concessions were common in 1983, and an assertion that Mr. McKennon has 45 years of experience as an appraiser. Appellant's Reply, at 12-13. However, this approach is highly conjectural. *See Tatten Partners, L.P. v. New Castle City Board of Assessment Review*, 642 A.2d 1251, 1257 (Del. Super. Sept. 9, 1993) ("[T]he County's appraiser rejected actually experienced data in favor of 'normalization' and the 'average experience' of other property owners. In the absence of a showing of bad faith or distortion by the taxpayer *this approach was highly conjectural.*") (quoting *Three Hundred Delaware Avenue Associates v. Board of Assessment Review*, Del.Super., C.A. No. 5174–75, Walsh, J., (May 7, 1976) (Letter Opinion) (emphasis in the original). *See also Id.* at 1258 ("[T]his Court finds that actual cost data is preferable over references to unspecified sources and data from a single other building...").

Faced with this presentation, the Board determined that Appellant's estimate did not provide support for lowering the assessment.[97] The Board pointed out that Appellant's expert did not present information on the percentage impact that rent concessions might have had on quoted rent in 1983 and provided only one example to substantiate his assertion that quoted rents were materially above actual rents.[98] Additionally, the Board found that testimony, that tenants pay an additional approximately 12% Market Factor for common areas, supported the quoted rent data relied on by the County.[99]

Although the Board found that Appellant's competent evidence overcame the presumption of the accuracy of the assessment, the Board was entitled to subsequently review the "evidence and testimony from both [Appellant] and the County" and to "ultimately choos[e] to find the County's assessment more

---

[97] *Woodlawn Trustees Inc. v. New Castle County Board of Assessment Review*, 1997 WL 524084, *6 (Del. Super. July 25, 1997) ("…an expert opinion is to be disregarded when it is devoid of any foundation.").

[98] Appellant concedes that its expert only relied on actual 1983 rental data from a single property (a property separate from the 1313 Property). Appellant's Reply, at 12-13. Moreover, Appellant acknowledges that "the notion that taxpayers are going to be able to track down actual rent rolls for multiple buildings from 36 years ago is fanciful." *Id.* at 13.

[99] The Board also determined that Appellant's calculation of depreciation under the cost analysis approach was largely attributed to the use of the unsubstantiated estimated 'actual' rent. Moreover, the Board noted that Appellant's assessment of depreciation was rebutted by evidence showing that the owners of the 1313 property have invested over $15 million in capital expenditures since 2011 (including $6 million since Appellant acquired the property).

26

credible."[100] Here, the Board ultimately found that Appellant's estimated rent was not supported by actual data and that the County's quoted rent evidence was more persuasive.[101] By providing reasons, the Board's rejection of Appellant's estimated actual rent did not amount to "rubber stamping."[102]

Appellant's contention that the Board violated FOIA is also without merit.[103] FOIA requires that "every meeting of all public bodies shall be open to the public

---

[100] *RRHC Wilmington, LLC v. New Castle County Office of Finance*, 2014 WL 2538886, at **9, 11 (Del. Super. May 30, 2014) ("[T]he Board considered the evidence presented by Appellants, found it lacked credibility in the face of the actual 1983 data, and denied Appellants' request for reassessment... The Board concluded that the County's evidence was more persuasive ... [as] it is entitled to do.").

[101] *Ferrara v. Board of Assessment Review for New Castle County*, 1995 WL 945549, at *4 (Del. Super. June 29, 1995) ("Essentially, this case boils down to a disagreement by two experts ... as to the proper valuation of the ... property, and [the appellant] asks this Court on appeal to weigh their testimony. However, the weight to be given an expert witness' qualifications and the content of his or her testimony is a matter within the province of the trier of fact."). *See also New Castle County Department of Finance v. Teachers Insurance and Annuity Association*, 669 A.2d 100, 103 (Del. Oct. 24, 1995) ("The County [was] free to use different valuation methodologies and to present evidence and argument in support of its position that the taxpayer's valuation is unreliable or otherwise inaccurate."); *Shahin v. City of Dover, Board of Assessment*, 2011 WL 704490, at *3 (Del. Super. Feb. 28, 2011).

[102] *Cf. Tatten Partners, L.P. v. New Castle County Board of Assessment Review*, 642 A.2d 1251, 1258 (Del. Super. Oct. 19, 1993) ("Since the Board gave no reasons for its decision other than the cryptic adoption of the economic rent theory, the Court must assume that it rejected the property owners position without attempting to assess the merit of owners presentation of value. Such an approach amounts to little more than "rubber stamping" the conclusions of the Board's agent.").

[103] Although 29 *Del. C.* § 10005(a) states that "[a]ny action taken at a meeting in violation of [FOIA] may be voidable by the Court of Chancery [and] [a]ny citizen may challenge the validity under this chapter of any action of a public body by filing suit," this Court has considered a FOIA claim in administrative appeals. *See, e.g., Beebe Medical Center v. Certificate of Need Appeals Board*, 1995 WL 465318, at *4 (Del. Super. June 30, 1995).

…"[104] A "meeting" is defined as "the formal or informal gathering of a quorum of the members of any public body for the purpose of discussing or taking action on public business."[105] In a FOIA claim, "the dispositive issue … is whether or not a 'quorum' of the members of the Board met or discussed privately."[106] "[G]enerally, [FOIA] do[es] not apply to conversations between less than a quorum."[107] Here, Appellant has not presented any evidence, or allegation, that a quorum of the Board

---

[104] *Reeder v. Delaware Department of Insurance*, 2006 WL 510067, at *8 (Del. Ch. Feb. 24, 2006) ("FOIA requires that every meeting of all public bodies shall be open to the public except those closed" for executive session as authorized by statute 29 *Del. C.* § 10004(a)…") (internal quotation marks removed) (internal brackets removed).

[105] 29 *Del. C.* § 10002(g).

[106] *Tyron v. Brandywine School District Board of Education*, 1990 WL 51719, at *3 (Del. Ch. Apr. 20, 1990) ("The statutory requirement of a quorum represents a legislative attempt, based on public policy reasons, to limit the reach of the open meeting law") (internal quotation marks removed) (quoting *Delaware Solid Waste Authority v. News-Journal Co.*, 480 A.2d 628, 634-35 (Del. July 9, 1984).

[107] *Id.* ("[I]n order for the Delaware Freedom of Information Act to apply, there must be a 'meeting,' which is defined in the statute as the formal or informal gathering *of a quorum* of the members of any public body for the purpose of discussing or taking action on public business.") (internal quotation marks removed) (emphasis in the original). *See also, King v. McKenna*, 2015 WL 5168481, at *9 (Del. Super. Aug. 24, 2015) (noting that the plaintiff who unsuccessfully asserted a FOIA claim "made no effort to plead that a 'meeting,' as defined by Section 10002(g), was in session…"); *Delaware Correctional Officers Association, et al. v. State*, 2003 WL 23021927, at *8, n. 42 (Del. Ch. Dec. 18, 2003) (noting that "[w]hether the Charging Parties have demonstrated that a 'meeting' within the meaning of [the FOIA statute] occurred" is a question that "would ordinarily be predicates to [a FOIA] analysis.").

28

members privately held a meeting to discuss his case.[108] Therefore, Appellant has not demonstrated that the Board violated FOIA.[109]

Furthermore, this Court has held that, for purposes of reviewing a Board's decision, "it is enough if the record sent to this Court includes a fair statement of the conclusions of the Board, as well as the facts material to show the grounds for those conclusions."[110] That the Board's written decision arguably includes rationales and conclusions not expressly articulated at the conclusion of the hearing[111] and that

---

[108] Board of Assessment Review of New Castle County Rules of Procedure, Article VI, Section 2 states that "[a] quorum of the Board is necessary to transact business at any meeting or hearing [and] ... shall consist of five (5) members appointed to the Board..."

[109] Appellant writes that he is not alleging that the Board held a secret meeting after the hearing in violation of FOIA. Instead, he contends that the Board violated FOIA by not having a second public meeting. He states that "in order for the Board's Written Decision in this case to comply with FOIA ..., a second public meeting should have been held, with notice to the parties, so the Board members could properly deliberate in public around the conclusions and rationale in the Written Decision and cast their votes accordingly." However, the only case Appellant cites in support of his position is not helpful to his claim. In *Delaware Correctional Officers Association*, the Chancery Court expressly stated that a determination of whether a "meeting" had occurred "would ordinarily be predicat[e] to [a FOIA] analysis," but, in finding that the FOIA claim lacked merit on its face, the Chancery Court found it unnecessary to make the preliminary determination of whether a meeting had taken place. 2003 WL 23021927 at *8, n. 42. Moreover, the Chancery Court, in *Delaware Correctional Officers*, also noted that "requiring the Board to convene a public meeting in order to allow Board members the individual opportunity to review the text of the written opinion prior to issuance would likely trigger a host of temporal problems." *Id.* at *8.

[110] *Conway & Conway v. Zoning Board of Adjustment*, 1998 WL 283393, at *2 (Del. Super. Feb. 20, 1998) (internal quotation marks removed) (holding that the petitioners' argument that the Board's decision was illegal because the written opinion contained a legal standard that was not articulated in the oral ruling is "devoid of merit"). *See also, 395 Associates, LLC v. New Castle County*, 2006 WL 2021623, at *5 (Del. Super. July 19, 2006) ("[E]ven in the context of the broader statutory *writ of certiorari*, this Court has held that a written decision is the controlling decision, the one upon which it primarily focuses.") (internal quotation marks removed).

[111] The Board members' comments at the hearing (pointed out by Appellant) do not necessarily show that the Board changed its rationale for denying Appellant's appeal after the hearing. The

29

some generalized comments of some Board members at the hearing were not included in the written decision are not a basis for this Court to set aside the Board's final decision.[112]

The Court also finds that Appellant's due process rights were not violated. Delaware law is clear that "[i]n an administrative hearing, due process does not require formal discovery."[113] "Rather, [d]ue process requires [only] that the notice inform the party of the time, place, and date of the hearing and the subject matter of

---

comments made by two Board members relating to "uniformity" appear to have been made to explain why the property had to be assessed at a 1983 value despite changing conditions in the CBD. The third Board member's comments appear to indicate that he viewed the cost approach as being "in line with the assessment." Board Hearing Transcript, at 257-62. These comments do not appear to conflict with the Board's written decision. In its written opinion, the Board rejected Appellant's cost approach analysis and found that evidence of capital investment in the property "supports the assessment under the cost approach by mitigating depreciation." Board's Opinion, at 12.

[112] The governing statutes require that the Board issue a written decision after an appeal hearing. The statute does not state that the Board must preview at the hearing its forthcoming written decision and does not state that the Board must subsequently reconvene, after its written decision, to discuss or justify its written decision. 9 *Del. C.* § 1318(2), which governs New Castle County specifically, states that "[f]ollowing the hearing of any property owner and, in the light of the facts produced at such hearing, [the Board shall] determine whether the assessment is correct." 9 *Del. C.* § 8312(b) requires the Board to "notify the appellant in writing, by registered mail, of its decision within 5 days of the date of its decision." 9 *Del. C.* § 8312(c) states that "[t]he decision of each board of assessment or Department of Finance or Department of Land Use shall be prima facie correct and the burden of proof shall be on the appellant to show that such body acted contrary to law, fraudulently, arbitrarily or capriciously." *See also Shahin v. City of Dover Board of Assessment Appeals*, 2016 WL 5407853, at *1 (Del. Sept. 27, 2016) ("On appeal to the Superior Court, and on further appeal to this Court, the *decision* of the Board of Assessment is deemed to be prima facie correct and will be disturbed only if the appellant can demonstrate that the Board of Assessment acted contrary to law, fraudulently, arbitrarily or capriciously.") (emphasis added) (internal quotation marks removed).

[113] *Purnell v. Department of Insurance*, 2017 WL 3980539, at *7 (Del. Super. Sept. 7, 2017).

the proceedings."[114] Here, Appellant does not contend that he did not receive proper notice. He was informed of the subject matter of the proceedings before the hearing which occurred on the noticed date.[115]

In addition, the County followed the Board's limited discovery rules.[116] Board Rules' Article VIII, Section 8 allows an appellant to request the County to disclose each exhibit that it intends to present in its case-in-chief in support of the assessment.[117] Upon receipt of the request, the County is to make available to the appellant one copy of each exhibit no fewer than seven business days prior to the hearing.[118] There is no requirement that the County identify its witnesses and the

---

[114] *Id.*

[115] Unlike in *Reybold Venture Group V-A, LLC v. New Castle County Office of Assessment*, the instant Appellant did not ask for a continuance in relation to any surprise witness or evidence presented at the hearing, and the County did not change its assessment during the hearing. *Reybold Venture Group V-A, LLC v. New Castle County Office of Assessment*, 2018 WL 3159234, *8-10 (Del. Super. June 27, 2018) (holding that denying appellant's request for a continuance when faced with newly revised assessments at the hearing violated the appellant's due process).

[116] Appellant concedes that "the Board's Rules of Procedure only require the County to turn over *its exhibits,* and *just seven (7) business days prior to the date of the hearing.*" Appellant's Opening Brief, at 31-32 (emphasis in the original). Indeed, Appellant acknowledges that the Board's rules do not require the County "to provide all documents and information utilized in support of the assessment along with any other materials required to interpret or otherwise decipher those documents." Appellant's Reply, at 21 (*quoting 1001 Jefferson Plaza Partnership, L.P. v. New Castle County Department of Finance*, 1995 WL 717610, at *4 (Del. Super. Nov. 8, 1995), *rev'd*, 695 A.2d 50 (Del. 1997)).

[117] Board Rules' Article VIII, Section 8 states, in pertinent part: "Upon receipt of a notice of hearing, an appellant may request that Assessment disclose each exhibit that it intends to present in its case-in-chief in support of the assessment."

[118] Board of Assessment Review of New Castle County Rules of Procedure, Article VIII, Section 8 states, in pertinent part: "Upon receipt of the appellant's request for disclosure, Assessment shall

rule does not require the County "to disclose any exhibit it may submit as rebuttal or impeachment evidence during the appellant's case-in-chief."[119] Here, the County, in compliance with the rules, produced the requested documents seven days before the hearing.[120] Additionally, Appellant does not claim that it requested that the County identify its witnesses. Moreover, under the Board's rules, Appellant was not entitled to discovery of the County's rebuttal evidence.[121]

Therefore, the Board did not act arbitrarily or capriciously in ruling against Appellant's claim concerning estimated actual rent evidence, and the Board's decision did not violate FOIA or Appellant's due process rights.

---

make one copy of each exhibit available to the appellant at the New Castle County Government Center, during regular business hours, no fewer than 7 (seven) business days prior to the hearing."

[119] Board of Assessment Review of New Castle County Rules of Procedure, Article VIII, Section 8 states, in pertinent part: "Assessment shall not be required to disclose any exhibit it may submit as rebuttal or impeachment evidence during the appellant's case-in-chief."

[120] Appellant's Opening Brief, at 5-6.

[121] Appellant's claim that the Board relied on evidence not in the record is also without merit. Appellant argues that one of the Board members asked Appellant's witness whether $75.00 per square foot was a safe figure for estimating, under the cost approach, the cost of construction of an office building in 1983 (It is unclear whether the witness agreed with the figure. The witness stated "Okay" in response). Board Hearing Transcript, at 217. Appellant contends that the $75.00 figure constitutes evidence of a Board member's personal knowledge that was not in the record and that the Board violated Appellant's due process by relying on this evidence. Although this Court has stated that it "should give due recognition to the Board's expertise in the area of assessment appeals and opportunity to view and evaluate the witnesses," it also stated that the Board may not "solely" rely upon "personal knowledge of its members unsupported by evidence in the face of countervailing competent and substantial evidence." *Bailey v. Board of Assessment Review Department of Land Use*, 2004 WL 1965867, at **1-2 (Del. Super. Aug. 19, 2004). Here, the Board's Opinion clearly shows that it did not rely "solely" on the Board member's $75.00 figure in making its decision, it is not mentioned in the written opinion, and the Board provided other reasons for its decision.

However, the Board did not address all of the elements that would determine the value of the 1313 Property.[122] Specifically, the Board's decision did not address how the high vacancy rate impacts the property's value. Delaware courts "have followed the general principle that *all elements* entering into the value of property are pertinent and relevant and to be considered by the assessors in valuing it."[123]

In *Commerce Associates, LP v. New Castle County Office of Assessment*,[124] the Delaware Supreme Court held that "New Castle County and the Board must consider *all relevant factors* bearing on what the units, in their current conditions, would have been valued at in 1983 [the County's base year for assessing property value],"[125] and "*all elements* entering into the value of property are relevant and must be considered by the assessors in determining value."[126]

So too, Delaware case law indicates that a high vacancy rate is a relevant factor when determining value under the income approach analysis. The Delaware

---

[122] *Commerce Associates, LP v. New Castle County Office of Assessment*, 159 A.3d 1206, 1207-08 (Del. Apr. 11, 2017) ("...Delaware law requires that *all relevant factors* bearing on the value of a property—in its current condition—be considered...") (emphasis added).

[123] *Id.* at 1207, n. 2 (*quoting Brennon v. Black*, 104 A.2d 777, 794 (Del. Apr. 27, 1954)) (emphasis added).

[124] *Id.* In that case, the Court held that depreciation is a relevant factor.

[125] *Id.* at 1208 (emphasis added).

[126] *Id.* at 1207, n. 2 (*quoting Delaware Racing Association v. McMahon*, 340 A.2d 837, 843 (Del. June 20, 1975)) (emphasis added).

Superior Court has recognized that "[a] buyer and seller, when determining the price of an income-producing property, will be primarily interested in the income likely to be produced by leases [and, in turn,] ... whether large portions of the property are unleased are certain to be taken into consideration."[127] Furthermore, the Court has noted that an appraiser using the income approach derives the value of an income-producing property by establishing the property's potential gross income and "adjusting the gross income amount for *vacancies*..."[128]

Here, Appellant's testimony that large portions of the 1313 Property are vacant was uncontradicted.[129] Although the Board considered that Appellant (in the

---

[127] *Excelsior Associates, L.P. v. New Castle County Department of Finance*, 1995 WL 347380, at *9 (Del. Super. Jan. 31, 1995) (In making its analysis, "[the appellant] was not in error to take into consideration the fact that a major part of the Property stands empty. Given the unrebutted analysis in the appraisal ... that the lease-up period will last approximately three years, the Court cannot find the vacancy is a temporary phenomena."); *New Castle County Department of Finance v. Teachers Insurance and Annuity Association*, 669 A.2d 100, 103 (Del. Oct. 24, 1995) ("The high vacancy rate not only meant that the property's income stream was reduced, but also that the owner would be forced to incur significant 'leasing up' expenses in order to obtain new tenants."). *See also Commerce Associates, LP v. New Castle County Office of Assessment*, 159 A.3d 1206, 1208, n. 7 (Del. Apr. 11, 2017) ("Delaware law requires that property be assessed based on its true value in money, which means the price which would be agreed upon by a willing seller and a willing buyer, under ordinary circumstances, neither party being under any compulsion to buy or sell.") (internal citations removed) (internal quotations removed).

[128] *Tatten Partners, L.P. v. New Castle City. Board. of Assessment Review*, 642 A.2d 1251, 1258 (Del. Super. Oct. 19, 1993), *aff'd, New Castle City. v. Tatten Partners, L.P.*, 647 A.2d 382 (Del. Apr. 21, 1994) ("An appraiser using the income approach derives a value for the building by establishing the potential gross income generated by the building (rental rate per square foot multiplied by square feet), and *adjusting the gross income amount for vacancies* and expenses to arrive at a net operating income, which is then converted to a property value by dividing the amount of net income by the capitalization rate.") (emphasis added).

[129] The County now also argues that the vacancy rate is a temporary phenomenon and that a temporary phenomenon is not to be considered in an assessment; however, there is no support in

past) benefited from the auction removing more than $40 million in debt[130] and (in the future) is "positioned … to generate future profits from the Property,"[131] the Board did not explain the relevancy of those findings in relation to the impact of a current condition – a high vacancy rate – on the property's fair market value.[132] As such, because the Board's decision did not reflect how the property's vacancy rate[133]

---

the record that the Board made a finding of fact as to whether the high vacancy rate is permanent or a temporary phenomenon.

[130] Appellant points out that the auction process was initiated by the lenders of the previous owners because the property was in default. Appellant's Opening Brief, at 25.

[131] *See supra*, at p. 13-14. The Board did not explain whether there was a relationship between those findings and the evidence showing that the property had a high vacancy rate. While the findings that the property's debt was reduced by $40 million and that the property has the potential to earn future profits may be relevant to the property's value, those findings do not excuse the Board from considering how the separate factor of a high vacancy rate also impacts the property's value.

[132] In *Commerce Associates, LP v. New Castle County Office of Assessment*, the Delaware Supreme Court explained that the County and the Board must take into account the *current conditions* of a building when using 1983 as valuation base year for assessments (even if that building, if in existence in 1983, did not actually have those conditions in 1983). In *Commerce Associates*, depreciation was a factor and the Court stated:

> New Castle County argues that because it uses 1983 as a base year for value and the properties in question were brand new in 1983, it does not need to apply depreciation to the value of the units as of 1983. But, there is an obvious flaw in that reasoning. Although New Castle County is permitted to use the base year approach, it must then consider what the value of the units—*in their current conditions*—would have been in 1983, and so must the Board. Here, despite the reality that the units are now more than 34 years old, New Castle County did not take into account any depreciation, and neither did the Board when the case was presented to it. (emphasis added).

*Id.* at 1208.

[133] Appellant contends that the property's vacancy rate was 43% when he appealed the County's assessment. Appellant's Reply, at 16. Appellant states that the vacancy rate at the time of the hearing was 33%. *Id.* at 16-17.

would bear on the value of the property, the Court must remand the matter to the Board to make a factual determination and conclusion on this issue.[134]

## Conclusion

Accordingly, the decision of the Board's decision is **REMANDED** for further proceedings consistent with this Opinion.

**IT IS SO ORDERED**.

_____
Diane Clarke Streett, Judge

---

[134] In *Commerce Associates, LP v. New Castle County Office of Assessment*, the Delaware Supreme Court held that "[t]he Superior Court should remand the matter to the Board, which should require New Castle County to reassess the value of the units, taking into account all relevant factors..." at 1209, n. 11. *See also Ren Centre L.L.C. v. New Castle County Office of Finance*, 2016 WL 399328, at *2 (Del. Super. Jan. 29, 2016). (The Court held that it "is not inclined to adjust the Board's final assessment based on inferences from the record, nor is the Court permitted to make its own factual findings on appeal. Therefore, the Court finds that this matter must be remanded to the Board for the purpose of correcting the error.").